James E. JOHNSON, Appellee,

v.

INTERSTATE POWER COMPANY,
Appellant.

INTERSTATE POWER COMPANY,
Appellant,

v.

D & J FEED SERVICE, INC.,
and Dale Jones, Appellees.

No. 90–1092.

Supreme Court of Iowa.

Feb. 19, 1992.

David L. Hammer and Angela C. Simon of Hammer, Simon & Jensen, Dubuque, for appellant.

James E. Thomson of Jacobson, Bristol, Thomson, Garrett & Swartz, Waukon, for appellee Johnson.

Richard J. Howes and Ronald L. Anderson of Howes & Anderson, P.C., Des Moines, and Jeanne K. Johnson, Des Moines, for appellees D & J Feed and Jones.

LAVORATO, Justice.

In this personal injury action, a feed mill employee sued a power company for injuries he sustained when working close to the power company's high voltage electrical lines. Before this suit, the employee received workers' compensation benefits because of these injuries. After the suit was filed, the power company filed a cross petition against the employee's employer and the employee's coemployee for indemnity.

The power company appeals from a jury verdict against it. On appeal the power company challenges several evidentiary rulings, a ruling directing a verdict against the power company on the indemnity claims, a ruling denying the power company's motion for directed verdict as to the employee's claim, and numerous instructions. The power company also claims the verdict was contrary to the law and to the evidence. We affirm.

I. *Background Facts.*

Interstate Power Company distributes electricity in parts of Minnesota, Illinois, and Iowa. In 1963 Interstate erected high voltage lines to furnish electricity to a feed mill now known as D & J Feed Service, Inc. The mill is located near Postville. In 1975 Interstate increased the voltage on the lines.

In 1976 D & J constructed a large grain processing machine—called a jetsploder—which cooks, rolls, and flattens grain fed from a cylindrical overhead bin. The jetsploder was positioned close to the northern most line closest to the plant, which carried 8000 volts after the 1975 upgrade.

The jetsploder was fully operational in 1977. A factory representative trained Dale Jones—a D & J employee—to operate the jetsploder. Jones then became the jetsploder's primary operator.

In 1983 Jones taught a new employee—James E. Johnson—to operate the jetsploder when Jones was gone. During Jones' 1983 vacation, Johnson ran the jetsploder without incident.

When Jones took his 1984 vacation, the task of running the jetsploder again fell to Johnson. While Jones was on vacation, D & J received a large feed order that required Johnson to start the jetsploder. After processing grain for a short time, Johnson noticed the grain flow into the jetsploder was decreasing. Johnson first thought the speed of flow might be too slow. He set the speed higher, but that made no difference. His next thought was that something was stopping the grain from coming into the jetsploder. Johnson then climbed several ladders and eventually reached a metal platform that was next to the upper "doghouse." Doghouse is a term Jones coined to describe various openings allowing inspection and maintenance of the machinery.

Once there, Johnson discovered the doghouse cover was off and to the backside of the doghouse. Johnson looked inside and saw that the auger and screen scalper were moving, but the grain was not.

Johnson thought there was something in the bottom of the doghouse that was blocking the flow of grain. At the bottom of the doghouse, there is an air gate that controls the flow of grain. Johnson thought that something might have been clogging the air gate.

Johnson noticed a metal pole lying nearby. The pole was about ten feet long. He picked the pole up and inserted it into the doghouse in an effort to break loose whatever he thought was causing the clogging. The next thing Johnson remembers is lying on a "catwalk" below where he had been standing.

From the physical evidence, the jury could find that, in withdrawing the pole, Johnson caused it to touch the 8000 volt line that was behind him. The accident left Johnson with several injuries: (1) initial cardiac arrhythmia, (2) a broken neck, (3) electrical burns to his hands and feet, (4)

skull and facial fractures, and (5) facial lacerations.

We set out additional facts in our discussion of the issues to which these facts are relevant.

## II. *Background Proceedings.*

Johnson sued Interstate for injuries arising out of this incident. In one division, he alleged negligent positioning, maintenance, insulation, and inspection of the electrical lines. In addition he alleged a failure to warn those working in close proximity to the lines of the danger in doing so.

In another division Johnson relied on Iowa Code section 478.16 (1983), which provided for a rebuttable presumption of negligence on the part of persons operating electrical transmission lines for injuries to person or property. *See* 1986 Iowa Acts, ch. 1198 (repealing section 478.16). Interstate answered, denying liability. Interstate later filed a third-party petition against D & J and Jones as third-party defendants, seeking indemnity from them.

D & J and Jones answered the third-party petition, denying liability. D & J's workers' compensation insurer filed a lien on all the proceeds of Johnson's suit for recovery of workers' compensation payments to Johnson because of the injuries he had suffered in this accident. *See* Iowa Code § 85.22 (notice of lien).

Following the district court's denial of D & J's and Jones' motion for summary judgment, the case proceeded to trial.

At the close of Johnson's evidence, Interstate moved for a directed verdict, which the district court denied. Interstate renewed its motion at the close of its evidence. The district court sustained the motion as to one division of Johnson's petition but denied it as to the other.

D & J and Jones also moved for directed verdict, and their motion was sustained.

The district court then submitted to the jury Johnson's claim against Interstate. The jury assessed seventy-five percent fault to Interstate and twenty-five percent fault to Johnson. The district court entered judgment for $156,000 and interest.

Later, Interstate filed motions for judgment notwithstanding the verdict and for a new trial. The district court denied both motions.

Interstate appealed, and we transferred the case to the court of appeals. In a three-to-three decision, the court of appeals affirmed.

Interstate applied to us for further review, and we granted its application. *See* Iowa R.App.P. 402.

Interstate raises numerous issues, which we consider in the following order.

## III. *Evidentiary Rulings.*

Interstate challenges three evidentiary rulings. The first challenge involves the district court's refusal to admit evidence of Federal and Iowa Occupational Safety and Health Act (OSHA) standards. The second challenge centers on the district court's admission of an industry standard that Interstate claims did not apply to the case. The last challenge focuses on the district court's limitation on Interstate's cross-examination of Johnson's treating doctor.

■ A. *The admissibility of the OSHA standards.* Shortly before trial, D & J and Jones filed a motion in limine asking the court, among other things, to exclude evidence about whether the mill was in compliance with the OSHA standards or with industry working standards. Following selection of the jury, the district court sustained the motion as to this request. The court concluded that any such violations were not relevant.

Following opening statements, counsel for Interstate raised a new argument: OSHA regulations impose a duty upon an employer to instruct employees as to electrical safety. Counsel for Johnson countered that an ordinary employer outside of the construction industry has no such duty. The court asked for a copy of the specific regulation, giving counsel until the following morning to find it. The court made it plain that its ruling would not be changed if the regulation pertained only to the construction industry.

The following morning the court refused to change its original ruling. The specific OSHA regulation that the court had requested had not been produced. The court repeated its earlier ruling that the OSHA regulations were not relevant to the case.

We think for two reasons the district court was correct.

First, in their argument to the district court, counsel for Interstate made specific reference to the OSHA regulations found in 29 C.F.R. 1926 dealing with safety training and education. Those regulations expressly relate to the construction industry and not to feed mills. Clearly, these regulations were not relevant.

■ Second, we have held that violation of an OSHA standard by an employer is negligence per se as to the employer's employee. *Koll v. Manatt's Transp. Co.*, 253 N.W.2d 265, 270 (Iowa 1977). We have also held that such a violation is evidence of negligence "as to all persons who are likely to be exposed to injury as a result of the violation." *Id.* But we have never held that the OSHA creates a duty in an employer that extends to a third party under an indemnity claim. We see nothing in the OSHA that suggests such an extension, and we refuse to do so.

We think our reasoning in *Reese v. Werts Corp.*, 379 N.W.2d 1, 5 (Iowa 1985) supports our decision not to extend the duty here. In *Reese* the plaintiff sued the installer of an elevator she had used because of injuries she suffered when the elevator fell from the first floor to the basement. The installer cross-petitioned against the plaintiff's employer for indemnity. We reversed the district court's ruling denying plaintiff's summary judgment motion as to the indemnity claim. The indemnity claim was based on state statutes requiring the employer to have the elevator registered for inspection by the state and to keep it in safe operating condition. We held that these statutes do not create an independent duty running from the employer to the elevator installer because

> [a]ny invasion of [the employee's] rights by [the employer] through violation of the statutes would not constitute an inde-

pendent invasion of any right of [the elevator installer].

*Reese,* 379 N.W.2d at 5. Similarly, here, the OSHA standards create no independent duty running from D & J to Interstate. This is so because any invasion of Johnson's rights by D & J or Jones because of the OSHA violations would not constitute an independent invasion of any right of Interstate.

Other courts have similarly refused to extend an OSHA duty to a third party seeking indemnity against an employer. *See, e.g., Scott v. Dreis & Krump Mfg. Co.*, 26 Ill.App.3d 971, 987, 326 N.E.2d 74, 85 (1975) (holding that manufacturer cannot introduce evidence to show duty to incorporate safety device on a press was on employer; such evidence was irrelevant on issue whether press was unreasonably dangerous and improperly sought to delegate the duty of the manufacturer to a third party); *Davis v. Niagara Mach. Co.*, 90 Wash.2d 342, 346–47, 581 P.2d 1344, 1347 (1978) (holding that manufacturer could not base its indemnity claim on ground that employer had breached duty to manufacturer arising under the OSHA because the OSHA only protects class consisting of employees); *see also,* 61 Am.Jur.2d *Plant and Job Safety* § 26, at 669–70 (1981).

B. *The admissibility of the industry standard.* To understand Interstate's second evidentiary challenge, we need to delve into some history regarding Iowa's adoption of the National Electrical Safety Code (NESC). Iowa Code section 478.20 (1983) authorized the Iowa state commerce commission (now the Iowa utilities board) to establish rules, regulations, or specifications to govern the "construction, operation, or maintenance" of electrical transmission lines. *See* Iowa Code § 478.20. Pursuant to this statute the commission established such "rules, regulations, or specifications." *See* 250 Iowa Admin.Code 25.1(1), 25.2, 25.2(1) (1982). The rules in existence on the date of this accident incorporated by reference the 1981 NESC as the minimum standards governing the construction, operation, or maintenance of

electrical transmission lines. *See* 250 Iowa Admin.Code 25.2, 25.2(1).

The 1973 NESC established minimum clearance standards for electrical transmission lines passing by buildings. The clearance standards for lines providing the amount of voltage like the lines in question required a horizontal clearance of three feet and a vertical clearance of eight feet. Experts for Johnson testified that the lines Johnson came into contact with did not meet these minimum clearance standards. Experts for Interstate testified they did. The difference was due to the different interpretations the experts gave the rule.

The 1981 NESC provided that existing structures which complied with past rules were not required to be modified to comply with the 1981 rules. The electrical transmission lines involved in Johnson's accident were established in 1963 and met the 1963 NESC provisions. The lines were changed in 1975, and the changes met the 1973 NESC requirements. All the experts agreed that clearance requirements in the 1973 NESC applied to the lines involved in Johnson's accident.

On cross-examination of Theodore Bernstein, one of Johnson's experts, Interstate's counsel questioned Bernstein about the 1977 NESC. The 1977 NESC had increased the minimum clearance requirements from what they were in the 1973 NESC. The 1977 NESC minimum clearance requirements mandated a horizontal clearance of five feet and a vertical clearance of ten feet. The electrical lines in question did not meet these new minimum clearance requirements even under Interstate's interpretation of the rule governing such requirements.

■ On redirect, Johnson's counsel offered into evidence plaintiff's Exhibit 13 which was a portion of the 1977 NESC dealing with the minimum clearance requirements. The following colloquy then took place among counsel and the court:

JOHNSON'S COUNSEL: And I was proposing to offer Plaintiff's exhibit 13.

INTERSTATE'S COUNSEL: Our objection to 13 earlier, your Honor, was that it isn't the applicable code and the

witness [Bernstein] has so testified. We thought it would confuse the jury, but I believe the Court ruled that all the codes could go in, so under the Court's ruling I think it goes in.

THE COURT: Well, I don't recall saying that all the codes go in, but if there is no objection.

. . . .

THE COURT: I'll receive it. I'll indicate to the jury that the exhibit is received.

INTERSTATE'S COUNSEL: Without objection I would hope.

THE COURT: Yes, I could indicate that.

Clearly, Interstate's counsel opened the door as to the 1977 NESC. Counsel went even further: he allowed those portions of the 1977 NESC dealing with minimum clearance requirements to come into evidence without objection. On this state of the record, we fail to see how the court erred in receiving this evidence.

■ We think the 1977 NESC minimum clearance requirements were also relevant and admissible. Johnson's experts emphasized that safety code requirements established only the minimum care required. These experts believed the 1977 NESC minimum clearance requirements represented the up-to-date thinking of the industry. Although the jury could not consider a breach of the 1977 NESC minimum clearance requirements as negligence per se, the jury was certainly entitled to consider such requirements as evidence of negligence.

■ C. *Limitation on Interstate's cross-examination of Johnson's treating doctor.* In another pretrial motion in limine, Johnson informed the district court that a hospital had filed a complaint with the Iowa board of medical examiners against the doctor who treated Johnson's injuries immediately after the accident. Apparently, according to the motion, the complaint alleged that the doctor in 1989 had wrongfully discontinued treating three people. The motion informed the court that the doctor had resigned from the hospital in question after the complaint was

filed and that the medical board had "dropped" the complaint after investigating its allegations. The motion alleged these matters were immaterial and irrelevant to the lawsuit. And the motion asked the district court to instruct the defendant and its counsel not to mention these matters to the jury without first obtaining court permission outside the jury's presence.

Interstate resisted the motion, contending that these matters pertained to the doctor's "credibility and abilities as a treating physician," both of which were proper subjects of cross-examination.

The district court heard the motion and resistance shortly after the jury was selected. The court simply granted the motion without comment. Thereafter, the doctor testified, and Interstate's counsel made no effort to cross-examine the doctor about the matters in the complaint.

Interstate now complains that the district court abused its discretion in denying it the right to cross-examine the doctor on the matters in the motion. We find no merit in this complaint.

We think it is significant that the court's ruling merely prohibited Interstate from mentioning the complaint to the jury without first obtaining permission from the court outside the presence of the jury. The district court did not rule that such evidence was inadmissible.

■ Generally, a ruling sustaining a motion in limine is not a ruling on the evidence; the ruling merely adds a procedural step to the offer of evidence. If the evidence is not offered, there is nothing preserved to review on appeal. *Twyford v. Weber*, 220 N.W.2d 919, 922–23 (Iowa 1974).

Here Interstate made no request to the court to bring the matters in the complaint before the jury. Nor did it make an offer of proof and have the court rule before the doctor testified. Because Interstate failed to follow these procedures, it failed to preserve any error for our review.

## IV. *D & J's and Jones' Motion for Directed Verdict.*

Interstate based its indemnity claim against D & J on the theory that when D & J purchased electricity from Interstate there was an implied agreement between them that D & J would use it safely. From this alleged implied agreement, Interstate claimed there were several independent duties running from D & J to Interstate. These, according to Interstate, included (1) D & J's duty to warn Interstate when D & J employees would be working near Interstate's electrical lines and (2) D & J's duty to adequately train its employees as to the care needed when working close to Interstate's lines.

Interstate apparently relied on Iowa Code section 85.20 in its indemnity claim against Jones. Of course, under this section Interstate would have to show that Jones was (1) grossly negligent and (2) that his gross negligence was a proximate cause of Johnson's injuries and damages. The gross negligence claim was based on two specifications: (1) a failure to adequately train and instruct Johnson in the performance of his duties and (2) a failure to warn Johnson of the dangers involved and the care needed in performing those duties.

At the close of Interstate's evidence, the district court sustained D & J's and Jones' motion for directed verdict on these claims. The court ruled as a matter of law that there was no independent duty running from D & J to Interstate. The court also ruled there was no substantial evidence of gross negligence "on the part of anyone connected with D & J and Dale Jones in particular." Interstate challenges both rulings. For reasons that follow, we think the district court correctly sustained the motion as to both third-party defendants.

■ Preliminarily, we review well-established principles regarding motions for directed verdicts. In ruling on such a motion, the district court must first decide whether the moving party has presented substantial evidence on each element of the claim. *Kurth v. Van Horn*, 380 N.W.2d 693, 695 (Iowa 1986). Evidence is substantial if a jury could reasonably infer a fact

from the evidence. *Briggs Transp. Co. v. Starr Sales Co.*, 262 N.W.2d 805, 808 (Iowa 1978). If evidence is not substantial, a directed verdict is appropriate. *Kurth*, 380 N.W.2d at 695.

Under the substantial evidence standard, if reasonable minds could disagree on an issue in light of the evidence presented, the court must submit the issue to the jury. *Id.*

 In addition, even when the facts are not in dispute or contradicted, if reasonable minds might draw different inferences from them, a jury question is engendered. Iowa R.App.P. 14(f)(17). When considering a motion for directed verdict, we view the evidence in the light most favorable to the party against whom the motion is directed. *Kurth*, 380 N.W.2d at 695.

With these principles in mind we first consider whether the evidence was sufficient to submit Interstate's indemnity claim against D & J. We then consider whether the evidence was sufficient to submit Interstate's gross negligence claim against Jones.

A. *D & J.* Iowa Code section 85.20 is the exclusive remedy provision of our workers' compensation law. It provides in part:

> The rights and remedies provided in this chapter ... for an employee on account of injury, ... for which benefits under this chapter ... are recoverable, shall be the exclusive and only rights and remedies of such employee ... at common law or otherwise, on account of such injury....

Iowa Code § 85.20.

The employer's immunity under section 85.20

> is only against actions for damages on account of the employee's injury; a third party's action for indemnity is not exactly for "damages" but for reimbursement, and it is not "on account of" the employee's injury, but on account of breach of an independent duty owed by the employer to the third party.

*Woodruff Constr. Co. v. Barrick Roofers, Inc.*, 406 N.W.2d 783, 785 (Iowa 1987) (quoting A. Larsen, *Workmen's Compensation: Third Party's Action Over Against Employer*, 65 Nw.U.L.Rev. 351, 368–69 (1970)).

In *Blackford v. Sioux City Dressed Pork, Inc.*, 254 Iowa 845, 850–53, 118 N.W.2d 559, 562–64 (1962), *overruled on other grounds*, 406 N.W.2d 783 (1987), this court first held that section 85.20 does not automatically preclude indemnity against an employer. In that case R.E. Langley had entered into a written contract with Sioux City Dressed Pork, Inc., to furnish the labor for washing the packing plant. The contract provided that Langley was to perform the contract "as he deems fit" and that "Langley shall have responsibility for personnel employed by him, while in the plant or elsewhere." *Id.* 254 Iowa at 847, 118 N.W.2d at 560. Blackford, an employee of Langley, was hurt when his hand was caught in a meat cleaning machine.

Langley paid Blackford workers' compensation benefits. Blackford then sued Sioux City Dressed Pork, claiming it was negligent in furnishing an unsafe machine. Sioux City Dressed Pork then cross-petitioned against Langley for indemnity or contribution. Sioux City Dressed Pork claimed Langley had failed to properly instruct Blackford in the use of the machine. The district court sustained a motion to dismiss the cross petition, and this court reversed.

This court held that the written contract implied a duty on the part of Langley to perform the cleaning job in a workmanlike manner and with due care. This court also held there could be an implied warranty to indemnify Sioux City Dressed Pork if Langley failed to safely perform the contracted duty. *Id.* at 850–53, 118 N.W.2d at 562–64.

Later we held that *Blackford* should not be read to require indemnity in all service contracts. *Woodruff*, 406 N.W.2d at 787. So we overruled *Blackford* to the extent that it could be read as holding that an implied agreement to indemnify would be read into all service contracts, "regardless

of the circumstances, and without regard to the fault of the proposed indemnitee." *Id.*

The question here is whether a promise to indemnify a supplier of electricity should be implied from its sale. In essence, Interstate is arguing that an employer—like D & J—which purchases a dangerous product like electricity for use in its productive process has not only a contractual duty to pay the price of electricity but also an implied contractual obligation to undertake the safety precautions urged by the seller. Several cases dealing with the sale of goods like machinery and chemical products suggest our answer to this novel question should be a resounding "no."

In *Olch v. Pacific Press & Shear Co.*, 19 Wash.App. 89, 573 P.2d 1355 (1978), an injured employee sued the seller and manufacturer of a hydraulic power press that caused the employee's injuries. The seller and manufacturer cross-claimed against the employer which had paid the employee workers' compensation benefits. Indemnification formed the basis of the cross claim. Notwithstanding the exclusive remedy provision in its workers' compensation law, Washington—like Iowa—does recognize a right of indemnity against an employer in certain circumstances. The Washington appeals court, however, refused to do so in *Olch* and affirmed the summary judgment dismissal of the indemnity claim. Rejecting an argument similar to Interstate's, the court said:

> The third-party plaintiffs claim a right to recovery under an implied contract of indemnification based upon a breach of an independent duty. They assert that the employer-buyer owed to the third-party plaintiffs a duty to operate the machine in a safe manner and to provide the machine with all necessary safeguards or safety devices. It is true that such a duty might exist in the abstract, but it does not run by implication to a machinery manufacturer when an employee is injured by a purchased machine operated by the employee.

*Id.* at 93–94, 573 P.2d at 1357.

The court laid down the rule that "[a]n agreement of an employer to buy a specific item and of a manufacturer to sell the specific item, without more, is not sufficient to meet the test required for indemnity." *Id.* at 95, 573 P.2d at 1358. The test referred to is this: an alleged breach of an independent duty must be shown to exist as a specific and defined duty before it will provide a basis for indemnity of a third party against an employer providing workers' compensation benefits. *Id.* (citing *Hysell v. Iowa Pub. Serv. Co.*, 534 F.2d 775, 782 (8th Cir.1976). An "independent" duty in this context means an obligation sufficiently independent so that it cannot be said to be a liability based "on account of" the employee's injury that forms the basis for the employer's immunity. Iowa Code section 85.20; *see also* 2B Larson, *The Law of Workmen's Compensation*, § 76.13, at 14–651–52 (1989) [hereinafter Larson].

Indemnity might have arisen, the court said,

> had the employer and the third-party plaintiffs entered into a contractual relationship in which the employer, in return for a reduction in the purchase price or for subsequent reimbursement from the manufacturer, agreed to inspect the machine, to perform necessary repairs, and to install subsidiary safety devices if necessary for the machine's safe operation.

*Id.* at 97, 573 P.2d at 1359. The agreement to inspect, to perform necessary repairs, and to install necessary subsidiary safety devices in this example constitute the independent duties the breach of which could form the basis of an indemnity claim against the employer.

Other courts have employed similar reasoning in rejecting an implication of indemnity on the part of an employer from a simple sale and purchase. *See, e.g., Steinmetz v. Bradbury Co.*, 618 F.2d 21, 24–25 (8th Cir.1980) (affirming district court's dismissal of indemnity action against employer) (interpreting Iowa law in holding there is no implied contractual duty on the part of an employer to pass along safety instructions from the manufacturer and seller to employees); *Kessler v. Bowie Mach. Works, Inc.*, 501 F.2d 617, 622 (8th Cir.

1974) (reversing judgment against employer on indemnity claim) (rejecting argument that indemnity claim should be allowed because employer wore two hats: as employer of the injured employee and as co-designer of the machine that injured employee); *Santisteven v. Dow Chem. Co.*, 506 F.2d 1216, 1217–20 (9th Cir.1974) (affirming district court's dismissal of indemnity action against employer) (rejecting argument that employer has "independent duty to avoid subjecting [the seller] to the risk of tort liability" and characterizing such an argument as "turn[ing] indemnity on its head"); *Larimer v. Raque Mfg. Co.*, 498 F.Supp. 37, 39 (S.D.Iowa 1980) (sustaining motion to dismiss indemnity complaint against employer) (rejecting argument that an independent duty to use due care was implied in sale of machine that caused injury to employee); *Therrien v. Safeguard Mfg. Co.*, 35 Conn.Supp. 268, 272–73, 408 A.2d 273, 275–76 (1979) (motion to strike indemnity complaint against employer sustained) (holding that employer has no independent duty "running to the manufacturer to use the machinery so as to avoid imposition of liability upon the manufacturer"); *but see Dole v. Dow Chem. Co.*, 30 N.Y.2d 143, 152–53, 282 N.E.2d 288, 290–91, 331 N.Y.S.2d 382, 390–91 (1972) (holding that indemnity claim would lie against employer based upon employer's failure to follow manufacturer's precautions on the label of fumigant causing death of employee).

Several of these cases quote the following passages now found in *Larson*, section 76.84, at 14–871, 14–876:

But when a purchaser buys a product, does he make an implied contract with the manufacturer to use the goods in such a way as not to bring liability upon the manufacturer? This would be stretching the concept of contract out of all relation to reality.... Clearly certain independent obligations run with the sale from the manufacturer to the buyer. But it seems unlikely that any court would be prepared to hold that [an] independent *contractual* obligation runs from the buyer to the manufacturer. To do this a court would have to announce the following doctrine: "Whenever a buyer purchases an article from a manufacturer, the buyer assumes an independent *contractual* obligation to the manufacturer not to use the article in such a way as to bring liability upon the manufacturer." There is very little authority for this proposition, and there is a large and growing body of authority to the contrary.

We find all this reasoning persuasive. We also find the rule these courts espouse consistent with our recently announced position on indemnity against employers. *See Woodruff*, 406 N.W.2d at 787 (an implied agreement to indemnify would not be read into all service contracts). So we hold that an employer who agrees to purchase a product does not impliedly agree to indemnify the seller *simply because of the purchase.*

Interstate, however, thinks it had something more than just an agreement to sell electricity. On cross-examination by Interstate's counsel, a D & J representative testified that D & J expected to use the electricity safely. The representative also testified that D & J would anticipate that Interstate would expect D & J to use the electricity safely. Interstate argues that this testimony establishes an independent duty on the part of D & J to use electricity safely and that this independent duty arises out of the agreement to purchase the electricity.

We view this testimony as describing nothing more than

the general duty that every member of society owes to every other member—the duty not to harm him through tortious acts. Such a general duty does not support a right of indemnity in a case where the would-be indemnitor is an "employer" covered by the workmen's compensation law.

*Hysell v. Iowa Pub. Serv. Co.*, 534 F.2d 775, 783 (8th Cir.1976) (quoting *Western Casualty & Sur. Co. v. Grolier, Inc.*, 501 F.2d 434, 438 (8th Cir.1974)). The testimony does not describe a duty that is of a "specific, defined nature" which would sup-

port a claim of indemnity against an employer. *See Hysell,* 534 F.2d at 782 (holding that an employer, through its employees, did not breach an independent duty to power company not to come in contact with power company's transmission lines because such a duty is a general duty, not an independent one); *see also Iowa Power & Light Co. v. Abild Constr. Co.,* 259 Iowa 314, 326–27, 144 N.W.2d 303, 310–11 (1966) (holding that "duty not to cause injury to another by one's negligent act" is "too broad to serve as a basis for permitting indemnity").

Significantly, on redirect the D & J representative testified he would expect everybody to use electricity safely and that Interstate would expect people generally to use electricity safely.

The representative also testified that the only agreement that D & J had with Interstate was to pay for the electricity Interstate supplied. The representative denied there was any agreement beyond that. This testimony remained uncontroverted throughout the trial.

Viewing all this evidence in a light most favorable to Interstate, we are led to conclude there was nothing more than the sale and purchase of electricity. This falls far short of establishing a submissible issue on the question of independent duty that is crucial to Interstate's claim of indemnity against D & J.

■ B. *Dale Jones.* As we said, Interstate relied on Iowa Code section 85.20 in its indemnity claim against Jones. The statutory immunity granted to the employer by the Iowa Workers' Compensation Act does not extend to coemployees. *See* Iowa Code § 85.20; *Craven v. Oggero,* 213 N.W.2d 678, 680–81 (Iowa 1973). So an injured employee can recover from a coemployee if the injured employee can prove that the injuries resulted from the coemployee's "gross negligence amounting to such lack of care as to amount to wanton neglect." *See* Iowa Code § 85.20.

■ Our common law has generated a three-part test that must be met to establish gross negligence as section 85.20 defines it. In *Thompson v. Bohlken,* 312 N.W.2d 501, 505 (Iowa 1981), this court stated there are three elements necessary to establish gross negligence: (1) knowledge of the peril to be apprehended; (2) knowledge that injury is a probable, as opposed to a possible, result of the danger; and (3) a conscious failure to avoid the peril.

■ Allegations of gross negligence also carry a high burden of proof. We have consistently held that all three elements must be proven before liability can attach. *See Eister v. Hahn,* 420 N.W.2d 443, 446 (Iowa 1988); *Woodruff Constr. Co. v. Mains,* 406 N.W.2d 787, 789–90 (Iowa 1987); *Taylor v. Peck,* 382 N.W.2d 123, 126–28 (Iowa 1986).

Applying the *Thompson* elements to the facts here, we think the evidence is insufficient to establish gross negligence on the part of Jones.

■ We cannot say that Jones knew that injury to Johnson from the positioning of Interstate's power line was probable and that Jones consciously failed to avoid such a result. Rather, the record suggests that Jones had no reason to believe that Johnson—or anyone else—would be working on the jetsploder near the point of contact with the power line.

Jones knew Johnson had operated the jetsploder on Jones' 1983 vacation without incident. Jones was entitled to assume Johnson would do so again in 1984. Further, Jones processed extra grain through the jetsploder before he went on his 1984 vacation. The evidence suggests an expectation by Jones that Johnson might not need to use the jetsploder at all during Jones' absence.

There was no evidence to suggest that Jones knew there was a metal pole near the doghouse or that Johnson would use it. Nor was there any evidence that employees had ever used a ten foot metal pole to unclog the jetsploder. Nor was there any evidence that Jones had instructed Johnson to use one. Finally, there was no evidence that a similar accident had ever occurred at the mill.

On this record any peril facing Johnson during Jones' absence was not the result of gross negligence by Jones as our law defines it. We therefore conclude, as did the trial court, that there was insufficient evidence of gross negligence under section 85.20 to generate a jury question and impose liability on Jones.

## V. *Denial of Interstate's Motion for Directed Verdict.*

At the close of Johnson's evidence, Interstate moved for directed verdict as to both counts of Johnson's petition. It renewed its motion at the close of all the evidence. The district court granted the motion as to division II of Johnson's petition (concerning repealed Iowa Code section 478.16's rebuttable presumption of negligence from injury) but overruled the motion as to division I (concerning Interstate's alleged specifications of negligence).

Interstate urged two grounds in support of its motion as to division I. First, Interstate argued that it had no notice or knowledge that "Johnson would be atop the jetsploder with a ten foot metal pole specifically to unclog the jetsploder." Second, it urged that the proximate cause of Johnson's injuries was his failure to look for the electrical lines and to avoid them.

■■■ A. *Notice.* A power company like Interstate has the duty to use reasonable care to adopt safeguards for its lines at places where people may reasonably be expected to come in close proximity to them. While not an insurer, such a company is held to the highest degree of care consistent with the conduct and operation of its business. And such a company may be negligent even though it has complied with the minimum requirements of safety codes and regulations. *Cronk v. Iowa Power & Light Co.,* 258 Iowa 603, 611–12, 138 N.W.2d 843, 848 (1965).

■■ Early on this court recognized why a power company has such a high duty of care:

The dangers arising from the production, transmission, storage, and use of electricity are among the greatest and most subtle known to mankind. Its proper management and control involve technical knowledge, skill, and care which are a sealed book to the great mass of the people, and without conscientious and intelligent care in creating and installing devices for its safe use, to say nothing of *constant watchfulness in their proper maintenance,* distressing and tragic results are sure to follow.

*Toney v. Interstate Power Co.,* 180 Iowa 1362, 1370, 163 N.W. 394, 397 (1917) (emphasis added). These observations are as true today as they were seventy-five years ago. This high degree of care carries over "to persons whose business or duty, or rightful pursuit of mere diversion or pleasure, brings them into the *zone of danger* created by the voluntary act" of the power company. *Id.* (emphasis added).

■■ On the question of foreseeability, this court has rejected the notion that before liability can attach, the power company must have foreseen how the accident might happen:

It was, of course, impossible for defendant to foresee in specific detail the way or manner in which the plaintiff or other person might suffer injury from the dangers created by the construction of the line in the manner described; but the gift of a prophet's vision is not a condition of liability. It is enough to impose the duty of protection if the danger created by the construction of the line above the telephone line was such that defendant knew or ought to have known that protection of some kind was necessary to save from harm all persons *lawfully engaged in that immediate vicinity.*

*Id.* at 1371, 163 N.W. at 397 (telephone repairman was injured while repairing telephone line over which defendant's power line ran; without repairman's knowledge, part of telephone line he was repairing crossed over the power line, became charged by the power line, and injured the repairman who was holding on to the telephone line) (emphasis added).

With these principles in mind we now turn to the evidence in this case.

Although the evidence was controverted, experts for Johnson testified that the lines causing Johnson's injuries did not meet clearance requirements under the Iowa Code in the area where Johnson was working when he was injured. Under its own corrective policy, Interstate had a duty to notify D & J of the clearance insufficiency. Interstate failed to give such a notice.

Other evidence shows that Interstate's service representative had made annual inspections each year from 1977 through 1984. These inspections were carried out for the very purpose of correcting clearance insufficiencies. In addition, over this same time period Interstate meter readers visited the transformer pole monthly to read the meter. These employees were expected to recognize and report safety hazards like a building built near or under a high voltage line. The jury also heard testimony that Interstate failed to correct a power line clearance problem near a D & J fertilizer tank for over four years.

The experts were also not in agreement on the question of accessibility. Interstate's experts testified that the area where Johnson was working was not accessible. Johnson's experts testified the area was accessible.

Physical evidence and testimony of D & J employees corroborated the testimony of Johnson's experts on this point. For example, the jetsploder ladders, platform, handrail, and electric motors are readily apparent on inspection. Two readily observable ladders went almost to the top of the jetsploder. D & J employees climb from the second of these ladders to the metal platform where Johnson was working by using a metal box (lower doghouse) and a horizontal I-beam to step up to the platform. In fact, before the accident, the employees had, hundreds of times, used this same procedure in reaching the upper doghouse to perform maintenance duties (including unclogging lodged grain in the upper doghouse). The metal on top of the lower doghouse that was used as a step was slippery from use.

Interstate was on notice or should have been on notice that human activity was taking place in an area close to its power line. So Interstate was obligated to make inspections to discover and remedy electrical hazards and defects like inadequate line clearances. In failing to carry out this obligation, the jury could find that Interstate had constructive knowledge of the electrical hazards for such a period of time that would have enabled it to discover the defect and correct it had the company adequately performed its duties. *See Levi v. Southwest La. Elec. Membership Coop*, 542 So.2d 1081, 1084–85 (La.1989).

In addition, the fact that Interstate had no actual knowledge of Johnson's activities immediately before the accident does not preclude recovery. To generate a jury question on foreseeability, the evidence need not establish that Interstate could foresee the very manner in which Johnson was injured. It was enough that the danger imposed by the power lines was such that Interstate knew or ought to have known that people working in that area would need protection.

B. *Proximate cause.* Interstate contends that Johnson's testimony entitled it to a directed verdict as a matter of law. Johnson testified he knew the lines were there and if he had looked he would have avoided them. Based on this testimony, Interstate contends it was Johnson's failure to look and avoid the lines and not the presence of the Interstate lines that was the proximate cause of the accident. In effect, Interstate asked the district court to find as a matter of law that Johnson's actions were the sole proximate cause of the accident or at least that his actions constituted more than fifty percent of the fault which caused the accident.

The conduct of a party is a proximate cause of damages when it is a substantial factor in producing damages and when the damages would not have happened except for the conduct. I Iowa Civil Jury Instructions 700.3 (1991); *Jones v. City of Des Moines*, 355 N.W.2d 49, 50 (Iowa 1984). There can be more than one proximate cause of an injury or damages.

Sole proximate cause means the *only* proximate cause. Sole proximate

cause is not a comparative fault defense because proof of sole proximate cause insulates a defendant from liability. In these circumstances, the fault of a defendant cannot be a proximate cause of a plaintiff's injuries. I Iowa Civil Jury Instructions 700.4 (1991) and comment; *Sponsler v. Clarke Elec. Coop., Inc.*, 329 N.W.2d 663, 665 (Iowa 1983).

Proximate cause is ordinarily a question for the jury. It is only in rare cases that a party establishes proximate cause as a matter of law. Iowa R.App.P. 14(f)(10). This is especially true in light of Iowa's comparative fault law under which a plaintiff can still recover even though the plaintiff may be found to be responsible for fifty percent of the fault that caused the accident. *See* Iowa Code § 668.3.

Johnson testified he was not consciously aware of the lines just before the accident happened. They were not in his immediate view as he climbed to the top. Nor were they in his immediate view when he plunged the pole into the second doghouse.

In addition, the jury could find from the evidence that a number of things were occupying Johnson's attention just before the accident. One of his experts testified that in these circumstances it would not be unexpected that Johnson would fail to take into consideration the power lines. *See Flattery v. Goode*, 240 Iowa 973, 978, 38 N.W.2d 668, 671 (1949) (one whose attention is diverted is not held to same closeness of observation otherwise required; in such cases, the question of negligence is for the jury).

On this record, we think proximate cause was a jury question. The jury could find— as it did—that Interstate's alleged negligence with respect to the lines combined with Johnson's negligence to cause the injury. Whether Johnson's negligence amounted to more than fifty percent of the fault that caused the accident was peculiarly under this record for the jury to decide. The jury, as it turns out, chose not to make such a finding.

## VI. *Instructions.*

Interstate finds fault with eight (numbers 19, 20, 23, 24, 27, 28, 29, and 32) jury instructions. Interstate also complains because the court refused to give its proposed instruction number 16.

We have carefully reviewed all of these instructions. We are convinced they correctly state the law and are supported by substantial evidence.

Interstate claims the district court left out important statements of law in some of the instructions. We find, however, that in some instances the court correctly deleted the statements and in other instances included the gist of those statements in other instructions. We also find that the gist of the proposed instruction the court refused to give was adequately covered in another instruction. Additionally, we note that the court instructed the jury to consider all the instructions together and that no one instruction contained all the applicable law.

On balance, we conclude the instructions were not prejudicial and adequately covered the theories of the parties.

For all these reasons, we find no merit in any of Interstate's challenges and complaints regarding the instructions.

## VII. *The Verdict.*

Finally, we find no merit to Interstate's complaint that the verdict is contrary to Iowa law and is not supported by the evidence. Our careful review of the record leads us to conclude otherwise. Interstate received what it was entitled to: a fair trial. A fair trial does not mean a perfect one.

## VIII. *Disposition.*

We have carefully considered all of the contentions and arguments whether or not we have discussed them. We find no error that would entitle Interstate to a reversal. Accordingly, we affirm.

DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.

CARTER, J., takes no part.