# IN THE COURT OF APPEALS OF IOWA

No. 24-0097
Filed May 7, 2025

**BREA ANNE GRIFFITH, Individually, as Administrator of the ESTATE OF MICHAEL LEE GRIFFITH, and on behalf of L.M.G., a minor,**
    Plaintiffs-Appellees,

**and**

**BRIAN L. GRIFFITH,**
    Plaintiff-Appellee,

**vs.**

**JOHN L. KULPER and TRAVIS J. GALLOWAY,**
    Defendants-Appellants.
_____

Appeal from the Iowa District Court for Benton County, Kevin McKeever, Judge.

Defendants appeal a jury verdict in a coemployee gross negligence action. **AFFIRMED.**

Matthew G. Novak (argued) and Bradley J. Kaspar (argued) of Pickens, Barnes & Abernathy, Cedar Rapids, for appellants.

Cory F. Gourley (argued) of Gourley, Rehkemper & Lindholm, PLC, West Des Moines, for appellee Brian Griffith.

John C. Wagner (argued) and John G. Daufeldt of John C. Wagner Law Offices, PC, Amana, for appellees Brea Griffith on behalf of the Estate of Michael Griffith and minor child L.M.G.

Heard at oral argument by Schumacher, P.J., and Buller and Sandy, JJ.

**BULLER, Judge.**

John Kulper and Travis Galloway (defendants[1]) appeal an adverse jury verdict ordering them to pay more than $2.8 million in a coemployee gross negligence action brought by Brea[2] and Brian[3] Griffith (plaintiffs) following the death of Michael Griffith while working at Wendling Quarries, Inc. (Wendling). The defendants claim they are entitled to judgment as a matter of law, that the district court erred in giving the gross negligence jury instructions, and allege evidentiary error in admitting references to administrative citations and purported non-disclosed expert testimony. We affirm.

## I. Background Facts and Proceedings

Michael was killed as a result of compression asphyxia when he fell into a lime surge hopper while working as a stockpile driver at Wendling—a surface mining business. Michael began working for Wendling in May 2019 and typically worked in quality control. His training for the stockpile driver position consisted of "one day shadowing an experienced stockpiler, the next day doing the work while being shadowed by an experienced stockpiler, and then the next day being observed while he did the work on his own," while other stockpile drivers remembered getting "about a week" of training. Michael only had a day of

---

[1] Claims against a third defendant were dismissed before trial on motion for summary judgment and at trial on directed verdict. We do not discuss those claims.

[2] Brea brought suit on behalf of herself, her late husband Michael's estate, and their minor child. We refer to them collectively as "Brea."

[3] Michael's father Brian brought a separate suit, which was consolidated with Brea's before trial.

worksite-specific training and had only about a week of training before his death in January 2020.

Stockpile drivers drive dump trucks under the lime surge hoppers—machines that load trucks with crushed rock or lime from the quarry, which the drivers then haul to stockpiles for customers. Buildup of material on the inside of the hopper requires workers to "lean over the hopper to scrape it" from above with a thirteen-foot pole while standing on a catwalk across the top of the hopper and more than eleven feet off the ground. The catwalks have a gate on either side, secured to the railing in an "up" position by removable linchpins. And in January, stockpile drivers reportedly would have to scrape the hopper "almost every time" they hauled a load. Wendling employees at trial agreed this was an inherently "dangerous job" and that the catwalk above the lime surge hopper was a "hazard." Stockpile drivers did not wear harnesses or lanyards when on the catwalk, despite the Wendling manual requiring them to do so.

Wendling moves operations to different quarries eight to ten times each year. Operations were set up at a new quarry the day before Michael's death; the day of his death was the first day anything was crushed at the new location. Galloway was a crushing superintendent and worked as Michael's supervisor at the time. Galloway was responsible for complying with applicable laws, Mine Safety and Health Administration (MSHA) safety standards, facilitating weekly safety meetings with employees, and examining each working place at least once every shift. Galloway generally drove a truck around the quarry to perform inspections on the freshly-reassembled equipment at the new location. And on the morning of Michael's death, Galloway "just briefly" visually inspected the hopper

Michael was killed in—from ten to fifteen feet away with his truck headlights. Galloway didn't get out of his truck or examine the catwalk railings, gates, and pins or whether they were secured.

Kulper worked for Wendling as the safety and environmental director at the time of the incident. His primary responsibilities did not involve day-to-day operations, but he ensured employees were equipped with adequate training and education to make safe decisions during work. The limestone hopper was one of the pieces of equipment within Kulper's purview.

At around 1:00 p.m. on January 8, an employee discovered the hopper's bin overflowing and the belt smoking—an indication the belt had been spinning "for a while." That employee and another climbed to the top of the limestone hopper and found Michael encased in lime at the bottom of the hopper. Michael had no pulse when his coworkers found him, did not respond to CPR, and was pronounced dead at the scene. Although Michael was still new as a stockpile driver that morning and was still training, no one directly witnessed the incident that left Michael dead.

A catwalk gate that workers were required to lean over to clean the machine was discovered in an open or "down" position at the scene; the removable linchpins typically used to secure the two gates to the catwalk railing were not in place on either gate. The gates were not secured by padlock nor was there any of the following: a "kill switch" to stop the hopper below when the gate was open, a vibration system to reduce buildup, a safety net or grate, or any type of harness worn by workers to prevent falling. The gates and railing around the catwalk were removable to permit movement from various quarries. And an employee who set

up the machine at the new quarry location agreed linchpins might not have been installed to secure the gate the day before Michael's death because "there's a lot of stuff that goes on" when Wendling moves to a new quarry.

MSHA—the governmental regulatory body that ensures the health and safety of miners—launched an investigation following this incident and found four violations of federal MSHA standards. Wendling had not been issued any citations prior to this incident.

Michael's wife Brea—on behalf of herself, Michael's estate, and their minor child—filed a petition asserting claims of coemployee gross negligence and loss of consortium. Later, Michael's father Brian filed a separate action with similar claims, which was eventually consolidated into this case. The district court denied Galloway and Kulper's motion for summary judgment and at trial denied their motion for directed verdict.

During the eight-day trial, the jury heard testimony from Brea's treating physician and therapist as fact or mixed fact-and-expert witnesses. The jury also heard extensive witness testimony describing the working conditions surrounding Michael's death, including the following:

- A former employee described when another employee fell into a hopper in 1996.
- An engineer testified: "When there's no railing into the hopper, anyone can fall into it accidentally or while trying to work around the hopper. It just prevents—there's no guardrail to prevent someone from falling in."
- Another stockpile driver at the time of Michael's death agreed "[t]he job that Michael Griffith was doing on the day that he died, at the time that he died, [i]s a dangerous job."
- An employee that set up the hopper agreed that if the "pins were not in place, that can be catastrophic" and "it's a safety concern . . . that

there's an inability to contact people" in the event of an emergency because there is no cellular signal.

- An expert witness with an MSHA certification described multiple violations of the standard of care.

- Wendling's president and owner said a running hopper is a hazard.

- Galloway—and later Kulper—agreed the job is inherently dangerous, and that "a kill switch," "[n]etting of some type . . . over the top of the hopper or a grate," "a safety harness and lanyard system," "a two-person notification system," "a welded solid catwalk fence," or "a lowered catwalk system around the side of the hopper" all "would have saved Michael's life had [they] been in place." Galloway agreed that "if th[e] gate had been padlocked and had [a lockout/tagout] procedure to lock it out, [Michael's death] never would have occurred." And he admitted the kill switch and two-person notification system would have been simple to implement.

- Galloway testified Michael did nothing wrong performing his workplace duties on the day of his death.

- Kulper agreed that "if a person is to find themselves in the hopper while it's running and it's not locked out or tagged out and nobody else sees that, it's highly likely to result in death."

- Kulper said there is nothing in the safety manual that describes navigating the catwalks or scraping the bins.

The jury awarded Brea, the minor child, and Brian more than $2.8 million dollars collectively. The defendants then filed a motion for judgment notwithstanding the verdict (JNOV) and alternative motion for a new trial. The district court denied both motions. Kulper and Galloway appeal.

## II.     Standards of Review

"The standard of review for a district court's denial of a motion for [JNOV] is for correction of errors at law." *Royal Indem. Co. v. Factory Mut. Ins.*, 786 N.W.2d 839, 846 (Iowa 2010); *see* Iowa R. App. P. 6.907. When reviewing these rulings, "we simply ask whether a fact question was generated." *Royal Indem. Co.*, 786 N.W.2d at 846. "To justify submitting the case to the jury, substantial evidence must support each element of the plaintiff's claim." *Smith v. Iowa State Univ. of*

*Sci. & Tech.*, 851 N.W.2d 1, 18 (Iowa 2014). When determining this, we view evidence in the light most favorable to the non-moving party. *Gibson v. ITT Hartford Ins.*, 621 N.W.2d 388, 391 (Iowa 2001). And we determine evidence to be substantial when reasonable minds can use the evidence to reach the same findings. *Doe v. Cent. Iowa Health Sys.*, 766 N.W.2d 787, 790 (Iowa 2009).

"[W]e review refusals to give a requested jury instruction for correction of errors at law." *Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 707 (Iowa 2016).

"We generally review challenges to district court decisions to exclude or admit evidence for an abuse of discretion." *Hawkins v. Grinnell Reg'l Med. Ctr.*, 929 N.W.2d 261, 265 (Iowa 2019). And "when we review the interpretation of a rule of civil procedure, such as rule 1.500(2), our review is for errors at law." *McGrew v. Otoadese*, 969 N.W.2d 311, 319 (Iowa 2022).

### III.   Discussion

Kulper and Galloway argue they are entitled to judgment as a matter of law, the district court erred in the gross negligence jury instructions, and evidentiary errors occurred at trial related to the admission of references to MSHA citations issued to Wendling and non-disclosed expert testimony. We address each argument in turn.

### A.  Judgment as a Matter of Law

Generally, Iowa's workers' compensation statutory framework is the exclusive remedy for workplace injuries. *See* Iowa Code § 85.20 (2020). But section 85.20(2) recognizes an exception when the workplace injury is "caused by [any] other employee's gross negligence amounting to such lack of care as to amount to wanton neglect for the safety of another." *See McGill v. Fish*, 790

N.W.2d 113, 120 (Iowa 2010) ("[S]ection 85.20 does not recognize or create a cause of action based on gross negligence, but merely recognizes a restriction on an existing common law right of action against a coemployee for negligence by including a portion of the claim within the exclusivity of the workers' compensation scheme."). This exception is "a narrow one." *Walker v. Mlakar*, 489 N.W.2d 401, 405 (Iowa 1992). And claims of gross negligence "carry a high burden of proof." *Johnson v. Interstate Power Co.*, 481 N.W.2d 310, 321 (Iowa 1992).

To prevail, the plaintiffs had to prove: "(1) knowledge of the peril to be apprehended; (2) knowledge that injury is a probable, as opposed to a possible, result of the danger; and (3) a conscious failure to avoid the peril." *Thompson v. Bohlken*, 312 N.W.2d 501, 505 (Iowa 1981). All three elements must be established against a defendant to succeed against that defendant. *See Henrich v. Lorenz*, 448 N.W.2d 327, 333 (Iowa 1989). The defendants here challenge all three elements.

**1. Knowledge of the peril to be apprehended**

Concerning the first *Thompson* element, a plaintiff must show "that a coemployee actually knew of a peril or hazard; otherwise, there cannot be a conscious failure on the coemployee's part to avoid the peril or hazard and thereby prevent the injured worker's injury." *Walker*, 489 N.W.2d at 404. Constructive knowledge is insufficient. *Id.* at 404–05. At the summary-judgment stage here, the defendants admitted, "there is no question all employees at Wendling knew there was some degree of risk in the work being performed. The first element established in *Thompson* is not in dispute." But in their post-trial motions, they seemingly switch their position and dispute that the first element was established.

In denying the motion for JNOV, the district court reasoned the jury was "provided with specific information regarding the dangers posed by the bin, the need to engage in scraping, the safety precautions which were ignored, and the likelihood of injury resulting from the ignored safety precautions." And the jury heard testimony from Kulper and Galloway that the interior of hoppers are "inherently" and "insanely dangerous" and that workers could be injured if they were in the bin. *See Thompson*, 312 N.W.2d at 505. We agree that substantial evidence supports that the jury could reasonably conclude Kulper and Galloway had actual knowledge of the peril. The court did not err in denying the motion for JNOV on the first element.

**2. Knowledge that injury is a probable, as opposed to a possible, result of the danger**

The "second element is usually determinative because it is exceptionally difficult for plaintiffs to prove that a defendant had the requisite knowledge an injury was probable, rather than possible, under the circumstances." *Lancial v. Burrell*, No. 20-0136, 2020 WL 5650616, at *2 (Iowa Ct. App. Sept. 23, 2020). "Element two requires more than a showing of the defendant's actual or constructive knowledge of the actuarial foreseeability—even certainty—that accidents will happen." *Alden v. Genie Indus.*, 475 N.W.2d 1, 2 (Iowa 1991) (cleaned up). Instead, "the plaintiff must show that the defendant knew or should have known that his conduct placed the plaintiff in a zone of imminent danger." *Jensen v. Vanderleest*, Nos. 9-369, 98-1950, 1999 WL 975879, at *4 (Iowa Ct. App. Oct. 27, 1999). A zone of imminent danger may be established in two ways:

> First, it can be made by proving defendant's actual or constructive awareness of a history of accidents under similar circumstances.

The second context in which we have found a zone of imminent danger is where the high probability of harm is manifest even in the absence of a history of accidents or injury. . . .

To satisfy element two of the *Thompson* test, the plaintiff must show not only the existence of a zone of imminent danger, but that the defendant knew or should have known that their conduct caused the plaintiff to be in that zone.

*Alden*, 475 N.W.2d at 2–3 (internal citations omitted).

As Brian concedes, the history of accidents under similar circumstances option is perhaps less convincing here because the last accident occurred in 1996—before both Kulper and Galloway were employed by Wendling—under different circumstances they may not have known. So, we focus our analysis on whether Brea and Brian generated a fact question on the second option: if "a high probability of harm [was] manifest" on the face of the conduct. *Hernandez v. Midwest Gas Co.*, 523 N.W.2d 300, 305 (Iowa Ct. App. 1994). And we see no legal error in the district court's analysis denying the motion for JNOV, which we reproduce and adopt as our own:

> When evaluating the relevant credible evidence in the light most favorable to the plaintiffs, the Court finds that the jury could have reasonably concluded that the configuration of the bin in question represented a zone of imm[i]nent danger. The Court further finds that the jury could have reasonably concluded that injury was probable as opposed to possible given the configuration of the bin and the numerous failures to observe basic safety precautions. The jury was provided with expert opinions that the bin was unsafe. They were provided with specific information regarding the dangers posed by the bin, the need to engage in scraping, the safety precautions which were ignored, and the likelihood of injury resulting from the ignored safety precautions. The jury could have reasoned (and apparently did reason), that a bin in such a configuration was less akin to a failure to adhere to the standard of care which posed a risk (negligence) and more akin to a zone of imminent danger (gross negligence). While the Court may not necessarily agree with this line of reasoning, the Court's job is to understand what the jury's reasoning could have been, not to substitute its own reasoning for the reasoning made by the jury. The job of making this determination

was left to the jury and the Court can find no obvious defect in the apparent reasoning made by the jury in this regard.

We have held before that a general peril in a workplace combined with additional circumstances can create a zone of imminent danger. *See, e.g.*, *Larson v. Massey-Ferguson, Inc.*, 328 N.W.2d 343, 345–46 (Iowa Ct. App. 1982) (finding the general peril of a running power take-off shaft combined with the employee being instructed to work in close proximity to the unshielded shaft with a jacket on and to put weight on the auger meant the defendant knew "injury was probable"). And our supreme court has found the second *Thompson* element was satisfied when the general peril of working with caustic soap, the defendants' knowledge about a tear in the employee's protective suit and that the protective sheets often slid down, and the defendants requiring the employee to continuously work with a defective suit created a probability of injury. *See Swanson v. McGraw*, 447 N.W.2d 541, 543–45 (Iowa 1989). Here, the defendants were aware of the general peril associated with being a stockpile driver, particularly as to the hopper. And the additional circumstances of an unsecured gate, missing pins, no warnings, missing supervision, and a mere pre-dawn visual inspection by headlights of the newly-reassembled hopper conducted from a distance on the day of Michael's death made the injury probable. Viewing this evidence in the light most favorable to Brea and Brian, there was substantial evidence to generate a fact question, and the district court did not err in finding a reasonable jury could have concluded this element was proven.

### 3. Conscious failure to avoid the peril

Few cases discuss the third *Thompson* element. But *Alden* is instructive because, in that case, "elements two and three are effectively coalesced." 475 N.W.2d at 2.[4] In *Alden*, a maintenance employee was painting a flagpole on a windy day using a manlift that was in the bed of a truck to reach the top of the pole. *Id.* at 1. The manlift had outriggers to provide stability, but they could not be used when the manlift was in the bed of the truck. *Id.* The supervisor directed the maintenance employee to finish the job despite the dangerous conditions, and the manlift collapsed causing the employee to sustain fatal injuries. *Id.* at 1–2. In determining elements two and three effectively coalesced, our supreme court said:

> The factual controversy surrounding the alleged order by [the supervisor] to use the manlift without outriggers would, if proved, demonstrate a "knowledge that the injury is probable" as well as "a conscious failure to avoid the peril." However, insofar as the alleged act is affirmative in nature, it is somewhat awkward to refer to it as "a conscious failure to avoid the peril." We, therefore, will consider the extent to which the facts herein give rise to a material dispute bearing on some aspect of element two.

*Id.* at 2. We generally agree with this reasoning as applied to the circumstances here, and we likewise find substantial evidence for element three.

And we also agree with the district court's analysis, which we again reproduce and adopt as our own:

> The conscious failure to avoid the peril suggests that the co-employee not only knew of the zone of imminent danger and knew it posed a risk of injury which was probable as opposed to possible, but in addition to those two conditions, the co-employee exposed the plaintiff to the known danger willingly. Whenever there is a question of intent, it poses a difficult hurdle because an individual's intent is rarely demonstrable by direct evidence or proof. However, it is

---

[4] Like the *Alden* court, we can see some overlap between elements two and three in this case.

reasonable for a fact finder to conclude that an individual intends the natural consequences of their actions. Therefore, if the defendants knew of the zone of imminent danger (which the jury obviously concluded in the affirmative) and further knew that the danger constituted an imminent threat (which the jury likewise concluded in the affirmative), than the act of sending any individual into the zone of imminent danger without first making the zone less dangerous is an act which could reasonably be concluded to constitute a conscious failure to avoid harm. There was substantial evidence provided in support of this line of reasoning.

Last, we note that there is substantial evidence as to both Kulper and Galloway despite their different roles in the day-to-day operations. The jury could have reasonably found that both knew of the danger posed by the hopper, the risk of injury associated with a dangerous job, the conscious failure to avoid the risk, and that an employee would be given Michael's job assignment the day of his death at the new quarry location. We find no error in the district court denying the motion for JNOV or the jury finding Brea and Brian met their burden as to all three elements. And we reiterate that it is not our role to substitute our view of the evidence for that of the jury—instead we only review for substantial evidence, respecting the jury's role as ultimate fact-finder.

### B. Jury Instructions

Kulper and Galloway next assert six errors in the jury instructions and that the case should be remanded for a new trial if judgment as a matter of law is not required. "Prejudice occurs and reversal is required if jury instructions have misled the jury, or if the district court materially misstates the law." *Rivera v. Woodward Res. Ctr.*, 865 N.W.2d 887, 892 (Iowa 2015). "Under Iowa law, a court is required to give a requested instruction when it states a correct rule of law having application to the facts of the case and when the concept is not otherwise

embodied in other instructions." *Herbst v. State*, 616 N.W.2d 582, 585 (Iowa 2000).

The defendants first argue the district court "erred by declining to instruct the jury that *Thompson* and its progeny require[] actual knowledge by defendants to satisfy the elements of gross negligence." The district court was correct in declining to add the "actual knowledge" language to the stock instructions because the jury instructions properly recited the *Thompson* test. Constructive knowledge can be used to prove the *Thompson* test's second element—that defendants had knowledge that injury was probable because of inadequate safety measures. *See Alden*, 475 N.W.2d at 3 ("[T]he plaintiff must show not only the existence of a zone of imminent danger, but that the defendant knew or should have known that their conduct caused the plaintiff to be in that zone."). As Brian argues, a layperson "would understand the meaning of knowledge" to mean actual knowledge. And Brea argues that the "use of 'conscious failure' tells the jury the coemployee had to be conscious of the peril for s/he to fail to avoid it consciously." *See State v. Ellison*, 985 N.W.2d 473, 482 (Iowa 2023) (words in a jury instruction need not be defined when they are not "beyond the lexicon of a reasonable juror"); *Thongvanh v. State*, 494 N.W.2d 679, 684 (Iowa 1993) (words do not require definition when they are "a term of common usage and readily understandable").

The defendants' second instruction claim is that the district court "erred by declining to issue an instruction stating the requirement the defendant knew his conduct placed the coemployee in such imminent danger that someone would 'more likely than not' be injured" instead of using the word "probable." The district court correctly declined to issue this instruction because it is required to give a

requested instruction that accurately conveys a rule of law *unless the law is already embodied* in the instructions. *See Herbst*, 616 N.W.2d at 585. "Probable" and "more likely than not" are synonyms. *See, e.g.*, *T.H.E. Ins. Co. v. Est. of Booher*, 944 N.W.2d 655, 664 (Iowa 2020) ("[I]n order to be probable, injury must be 'more likely than not.'" (citation omitted)). This is a distinction without a difference and a correct statement of the law.

Third, the defendants argue the district court erred by declining to issue a nonstock instruction explaining that the plaintiffs cannot prove the second element of the *Thompson* test by simply showing they "knew that sooner or later, someone would be injured." The proposed language was not embedded elsewhere in the jury instructions, but the given instructions accurately described gross negligence law. And the proposed language is extraneous and carried a risk of confusing or misleading the jury. The district court did not err in declining to give this novel instruction.

Fourth, the defendants assert "the district court erred by declining to issue an instruction stating the jury should consider each defendant's knowledge of the history of the work being performed and whether there were any prior injuries or complaints about safety." The district court correctly declined to give this instruction, as this standard was inapplicable given the facts adduced and theory advanced at trial. The plaintiffs did not rely on evidence of prior injuries or safety complaints to establish a zone of imminent danger. Instead, they argued that the hopper's safety deficiencies were inherently hazardous, making the risk of injury apparent on its face.

Fifth, the defendants argue the court erred by declining to issue an instruction providing, "evidence that the defendant exposed himself to the same risk of injury as the plaintiff is a strong indication that the defendant did not know that injury was a probable result of the danger." It is true that courts have sometimes used defendants engaging in the same conduct that injured the plaintiff as a potentially relevant factor. *See Hernandez*, 523 N.W.2d at 305–06; *Henrich*, 448 N.W.2d at 333; *Lavery v. Campbell*, No. 24-0517, 2024 WL 4969304, at *4 (Iowa Ct. App. Dec. 4, 2024). But, as Brian argues, neither Kulper nor Galloway engaged in the same conduct under the same circumstances as Griffith

> work[ing] on the catwalk, scraping or otherwise, when the gate was unsecured, there were no pins, there was only wire around one gate, the machine was running, it had recently been set up, and no inspection had been completed by a competent person or otherwise, and they hadn't been warned of the imminent danger.

And this is not an express element of *Thompson*. In the interest of juror comprehension and efficiency, the district court was not required to include every potentially relevant factor in the jury instructions.

Finally, the defendants argue the stock jury instructions improperly define "probable" and "possible." The stock instructions are supported by caselaw and have existed for decades. *See Nelson v. Winnebago Indus., Inc.*, 619 N.W.2d 385, 391 (Iowa 2000) (defining "probable" as "that which seems reasonably to be expected: so far as fairly convincing evidence or indications go") (cleaned up)); *Juarez v. Horstman*, No. 0-990, 2011 WL 441523, at *3 (Iowa Ct. App. Feb. 9, 2011) (defining "possible" as something "which happen[s] so infrequently that they are not expected to happen again") (citation omitted)). We find no error

in using these definitions and in any of the challenged jury instructions regarding gross negligence.

## C. Admissibility of Evidence of the MSHA Citations

The third issue the defendants raise is that the district court properly excluded the MSHA report and citations themselves but erred in admitting the underlying evidence of the accident and citations issued to Wendling, claiming it was "inadmissible hearsay and lacked relevance given there was not a knowing violation of MSHA regulations." *See* Iowa Rs. Evid. 5.802, 5.803(8)(B)(iv). Although we recognize there are interesting legal questions surrounding whether the citations themselves were perhaps admissible (and thus the district court was perhaps over-cautious in exercising its discretion), we elect to bypass those issues and instead focus our review on the narrow question of whether admitting some information underlying the citations (but not the citations themselves) prejudiced the defendants.

After careful review of the record, we conclude any alleged error was not prejudicial. The jury was informed that Wendling did not admit liability on the underlying MSHA issues relating to the citations. And, in light of the jury instructions that cabined the jury's review to the defendants' actual knowledge, this did not confuse the jury. We see no reasonable probability that this testimony tipped the scales toward liability given that the defendants' own testimony established what they did and did not know. In our review, this renders the challenged evidence largely cumulative and its admission harmless. *See State v. Elliott*, 806 N.W.2d 660, 669 (Iowa 2011) (considering admission of hearsay evidence in context of cumulative evidence and harmless error).

### D. Non-Disclosed Expert Testimony

Kulper and Galloway last claim the district court abused its discretion by permitting testimony from Michael and Brea's treating medical provider and Brea's therapist. The treating medical provider—a licensed physician's assistant—was designated by the plaintiffs as "a fact and expert witness" and testified about her background, Brea's personality, and care and treatment of Brea after the incident regarding her mental health and pregnancy. Defense counsel objected when she was asked to describe Brea to the jury and discuss her mental-health consultations. On appeal, the defendants argue this was improper "undisclosed expert testimony offered for the sole purpose of stoking sympathy from the jury."

Brea's therapist was designated as a fact witness in initial disclosures and testified generally about Brea's therapy process. Defense counsel again objected, arguing that she was a non-retained expert witness.

Upon a careful reading of the record, we find the testimony from these witnesses was not expert testimony and was properly disclosed to the defendants before trial. The witnesses did not implicate the disclosure requirements of Iowa Rule of Civil Procedure 1.500(2)(c). And as the district court noted:

> The witnesses in question did not provide a report, did not indicate that any opinions would be to any level of any particular type of scientific or medical certainty, and did not offer any opinions on any matters which would require an expert under the rules. The defendants simply did not like their testimony because it lent credibility to the plaintiffs' claims.

We agree, find no error in the district court overruling defense counsel's objections at trial, and deny the request for a new trial.

**AFFIRMED.**