**BEYOND THE GARDEN GATE, INC., Third–Party Appellee,**

v.

**NORTHSTAR FREEZE–DRY MANUFACTURING, INC., Third–Party Appellant,**

v.

**COPELAND CORPORATION, Crossclaim Appellee.**

No. 93–956.

Supreme Court of Iowa.

Jan. 18, 1995.

Stanley J. Thompson of Davis, Hockenberg, Wine, Brown, Koehn & Shors, P.C., Des Moines, for appellant.

Jerry Crawford, Des Moines, and Dorothy K. Goodman of Barnhill & Goodman, P.C., Des Moines, for appellee Beyond the Garden Gate.

Randall H. Stefani and Michael J. Eason of Ahlers, Cooney, Dorweiler, Haynie, Smith & Albee, P.C., Des Moines, for appellee Copeland Corp.

Considered by McGIVERIN, C.J., and LAVORATO, NEUMAN, ANDREASEN, and TERNUS, JJ.

LAVORATO, Justice.

A third-party plaintiff purchased a used freeze dry machine from a seller who had purchased the machine from a third-party defendant-manufacturer. The district court submitted to the jury the third-party plaintiff's claim for breach of express warranty under Iowa's Uniform Commercial Code (U.C.C.). As part of the claim, the court permitted the jury to consider direct economic loss damages and consequential economic loss damages. The jury refused to award the third-party plaintiff direct economic loss damages but did award consequential economic loss damages. Because we conclude the third-party plaintiff was not entitled to consequential economic loss damages, we reverse and remand with directions.

A crossclaimant obtained a judgment against the third-party defendant-manufacturer on an indemnity claim consisting of costs, attorney fees, and witness travel fees and expenses. We affirm the district court's nunc pro tunc order amending the judgment for indemnity to reflect the true corporate name of the third-party defendant-manufacturer.

I. *Background Facts.*

Beyond the Garden Gate, Inc. (formerly Kristen Mease, d/b/a Beyond the Garden Gate) (BGG) is an Iowa corporation. BGG and its predecessor have been in operation since September 1989, when Mease decided to get into the freeze-dried flower business. She visited the home office of Northstar

Freeze–Dry Manufacturing, Inc. (Northstar) in Nisswa, Minnesota, in June. She visited Northstar because of a Northstar advertisement for a floral freeze dryer that it manufactured. While at Northstar, Mease met with employees. She received both verbal and written information about what the Northstar freeze dryer allegedly could do.

Some of the information Mease received was contained in a Northstar brochure. The brochure emphasized the alleged dependability of the freeze dryer, promising that when the machine is properly maintained, it will run around the clock. This statement was backed up by marketing and cost projection information Mease received while at Northstar. Through this literature Mease learned that the machine would freeze-dry a load of flowers in seven to ten days.

Mease also learned that a businessman in Iowa already had a Northstar freeze dryer. She was encouraged to go to Richard De-Long's Lamoni business and check out the performance of his Northstar machine. De-Long had purchased the machine from Northstar in October 1988. In January 1989 DeLong had replaced the compressor.

Mease contacted DeLong and found out that he had the used Northstar freeze dryer for sale. In August 1989 she purchased the machine for $17,500. In September she started freeze-drying flowers.

Over time, problems began to develop with the machine. Mease thought she would be able to freeze-dry three loads of flowers each month as Northstar had advertised, but the machine could only turn out two loads. In March 1991, the compressor quit working. Mease replaced it with another, but this one quit within a short time. A second replacement compressor was installed, and it too failed. These incidents were followed by a series of repairs, none of which completely fixed the machine. Lehman Commercial Service, Inc. (Lehman) did the repairs.

In September 1991 the compressor failed again. Mease decided she could not afford to spend any more money on the freeze dryer. She sold it for $10,000, and purchased a new floral freeze-dry machine from a different manufacturer.

## II. *Background Proceedings.*

When Mease failed to pay Lehman for the compressor repairs, Lehman filed suit against Mease, d/b/a Beyond the Garden Gate, for the repairs. Mease answered Lehman's petition and counterclaimed. Mease also filed a third-party petition against Northstar. Mease amended her petition several times. One amendment also named Copeland (the manufacturer of the compressors), Copeland's Iowa distributor, and Copeland's Minnesota distributor. At this point the court ordered Mease to recast her third-party petition. The recast third-party petition alleged breach of implied and express warranties and fraud against Northstar and breach of implied warranty against the other third-party defendants.[1]

Copeland answered the recast third-party petition and later asserted a crossclaim against Northstar for indemnity.

Only BGG's claims against Northstar and Copeland proceeded to a jury trial. The jury returned the following special verdict finding Northstar liable to BGG for breach of express warranty:

*Question No. 1:* Was the defendant Northstar at fault for breach of express warranty?

. . . .

Answer: *yes* That the Northstar equipment is designed to the highest standards and has a reputation for ease of operation and unsurpassed reliability.

---

1. Mease filed her recast petition on January 15, 1992. In the recast petition she designated the third-party plaintiff as "Beyond the Garden Gate, Inc.," which she had incorporated under Iowa law in December 1991. This was nine months after Lehman filed the original petition against Mease.

Under Iowa Rules of Civil Procedure 34 and 81, we normally would question Mease's authority—in her third-party suit—to substitute as third-party plaintiff an entity that was not and could not have been a party to the original lawsuit. However, we give this no further consideration as none of the third-party defendants raised the issue with the district court or on appeal. All subsequent references in this opinion are to BGG as third-party plaintiff.

*yes* That when it is properly maintained, their equipment will operate continuously 24 hours a day, 365 days a year.

*yes* That the machine's cycle is 7 to 10 days.

The jury concluded that Northstar was 100% at fault for BGG's damages, and awarded BGG $40,000 in consequential economic loss damages on its breach of express warranty claim against Northstar. The jury, however, awarded BGG no direct economic loss damages. The jury found against BGG on its fraud claim against Northstar. The jury found no fault on the part of Copeland.

After the jury trial, Copeland's indemnity claim against Northstar was tried to the court. The court upheld the validity of the indemnity agreement between Copeland and Northstar. The court ultimately entered judgment in favor of Copeland and against Northstar· for $21,473.63, which included Copeland's legal costs, attorney fees, and witness travel fees and expenses. The court also overruled Northstar's posttrial motion for judgment notwithstanding the verdict or new trial in BGG's third-party action and entered judgment against Northstar.

Northstar appealed. When Copeland tried to execute on the judgment, it discovered that the court had rendered judgment against Northstar Companies instead of Northstar Freeze–Dry Manufacturing, Inc., its true name.

Copeland and BGG filed separate applications for a nunc pro tunc order to amend the judgment and reflect Northstar's correct corporate name. Following a hearing, the district court granted the nunc pro tunc application. Northstar also appeals from the nunc pro tunc ruling.

■ This case was filed and tried as a law action, so our review is for legal error. Iowa R.App.P. 4.

### III. *Damages.*

For purposes of this opinion, we assume without deciding that the district court correctly determined there was a submissible claim for breach of express warranty against Northstar even though there was no privity

between Northstar and BGG. So we proceed directly to the damages issue.

■ As we said, the jury awarded BGG no direct economic loss damages but did award it $40,000 in consequential economic loss damages. Northstar complains that the district court erred in allowing BGG to recover such damages. Northstar's argument here—as it was in the district court—is that a nonprivity plaintiff, like the third-party plaintiff here, can recover on an express warranty no more than direct economic loss damages. For reasons that follow, we agree.

In one instruction, the district court instructed the jury that the damages they could award for the breach of warranty was "the difference between the amount plaintiff paid for the goods and the value they would have had if they had been [as] warranted . . . unless special circumstances show proximate damages of a different amount."

In two other instructions, the court told the jury this:

#### Instruction No. 38

Consequential damages are those damages resulting from the breach, which include:

(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting has reason to know and which could not reasonably be prevented by cover or otherwise; and

(b) injury to persons or property proximately resulting from any breach of warranty. . . .

#### Instruction No. 39

Lost profits can be recoverable so long as the profits are not based on conjecture or speculation.

The jury's verdict was reflected in the following verdict form:

State the amount of damages sustained by the plaintiff . . . for each of the following items. . . .

| | |
|---|---|
| 1. Repair bills | $ 3,100 |
| 2. R13 freon | 400 |
| 3. Lost flowers | 2,000 |
| 4. Lost training profits | 10,500 |
| 5. Lost profits/sale of machine | 0 |
| 6. Lost business profits | 24,000 |
| TOTAL: | $40,000 |

Iowa Code section 554.2714 sets out the measure of damages for breach of warranty:

. . . .

(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(3) In a proper case any incidental and consequential damages under the next section may also be recovered.

Incidental and consequential damages are covered in Iowa Code section 554.2715:

(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

(2) consequential damages resulting from the seller's breach include

(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(b) injury to person or property proximately resulting from any breach of warranty.

■ The measure of damages in section 554.2714(2) has been referred to as "direct economic loss." James J. White & Robert S. Summers, *Uniform Commercial Code* § 11–5, at 536 (3d ed. 1988) [hereinafter White and Summers]. Such losses are "damage flowing directly from insufficient product quality." *Id.* So they include "ordinary loss of bargain damages: the difference between the actual value of the goods accepted and the value

they would have had if they had been as warranted." *Id.*

■ The measure of damages in section 554.2715(2) has been referred to as "consequential economic loss." *Id.* This loss includes "loss of profits resulting from failure of the goods to function as warranted, loss of goodwill, and loss of business reputation," and "other loss proximately resulting from a defective product beyond direct economic loss." *Id.* at 536, 539.

■ Courts allow a nonprivity buyer to recover for direct economic loss damages if the remote seller has breached an express warranty. *Id.* at 538. On the other hand, courts are split on whether to allow a nonprivity buyer to recover consequential economic loss damages. *Id.* at 539. White and Summers make a good argument for siding with those courts that have refused to allow remote or nonprivity buyers from recovering consequential economic loss damages:

We agree with those courts that have refused to allow recovery of consequential economic loss by remote buyers. Even if relevant policies justify allowing nonprivity consumers to recover for direct economic loss, there can be no justification in the usual case for allowing nonprivity consumer buyers to recover for consequential economic losses they sustain. Remote buyers may use a seller's goods for unknown purposes from which enormous losses might ensue. Since the remote seller cannot predict the purposes for which the goods will be used he faces unknown liability and may not be able to insure himself. Insurers are hesitant to insure against risks they cannot measure. Moreover, here more than in personal injury and property damage cases, it is appropriate to recognize the traditional rights of parties to make their own contract. If a remote seller wishes to sell at a lower price and exclude liability for consequential economic loss to sub-purchasers, why should we deny him that right? Why should we design a system that forces him to bear the unforeseeable consequential economic losses of remote purchasers? Indeed, by forcing the buyer to bear such losses we may.

save costly law suits and even some economic losses against which buyers, knowing they have the responsibility, may protect themselves. In short, we believe that a buyer should pick his seller with care and recover any economic loss from that seller and not from parties remote from the transaction. Put another way, we believe the user is often the "least cost avoider." By placing the loss on him or by forcing him to bargain with his immediate seller about the loss, we may minimize the total loss to society. If the manufacturer is not the least cost risk avoider, but must nevertheless bear the loss, we may cause him to spend more of society's resources than are optimal to avoid the loss and may unnecessarily increase the cost of the commodity sold.

*Id.* at 539–40. We agree and now hold that nonprivity buyers who rely on express warranties are limited to direct economic loss damages.

Here the jury refused to allow BGG direct economic loss damages. The direct economic loss damages amounted to $7,500, the difference between what BGG paid for the machine ($17,500) and what BGG sold it for ($10,000). The jury, however, awarded BGG consequential economic loss damages in the amount of $40,000, represented by repair bills, R13 freon, lost flowers, lost training profits, and lost business profits. Because BGG was not entitled to such damages, we conclude the district court committed reversible error in submitting them.

### IV. *Amendment of Judgment.*

As noted earlier, the district court tried Copeland's indemnity claim against Northstar after the jury trial on BGG's third-party claim. The court upheld the validity of the indemnity agreement between Copeland and Northstar, awarding Copeland $21,473.63. This judgment is still outstanding. That requires us to address additional issues Northstar has raised regarding the judgment.

After the judgment was rendered, BGG and Copeland applied for a nunc pro tunc order to reflect the full and correct name of Northstar. The district court granted the nunc pro tunc application.

■ A. *The validity of the nunc pro tunc order.* Northstar's first contention is that the nunc pro tunc order granted relief beyond correcting a clerical error. Northstar argues that the application sought to change the substantive form of the judgment by adding a new party. It also argues that it is an attempt to amend the pleadings by adding a defendant that was not previously a party to the action. We disagree.

■ A nunc pro tunc entry is one made now of something which was previously done, to have effect as of the former date, the function, object, or purpose of such entry being to make the record speak the truth; to supply on the record something which has actually occurred, but has been omitted from the record through inadvertence or mistake. More specifically it has been held that the purpose of a nunc pro tunc entry is to correct mistakes of the clerk or other court officer, or inadvertence of counsel, or to settle defects or omissions in the record, so that it will show what actually took place.

*State v. Walker,* 304 N.W.2d 193, 196 (Iowa 1981) (citation omitted).

The mistake here was a clerical error and nothing more. The nunc pro tunc order merely corrected the error by clarifying the proper name of Northstar in the judgment. No new party was added and no defendant was added that was not previously a party to the action.

Moreover, from the filing of the petition, Northstar was on notice that it was being sued. Northstar knew that despite the caption on motions, pleadings, depositions, and other court papers, it was the proper defendant. Northstar appeared and answered. Northstar prepared for and went to trial. Northstar provided a defense. Northstar's answer reflected its true name. So the judgment was against only one party, the party who was before the court at all times.

■ B. *Lack of jurisdiction.* When the nunc pro tunc order was entered, this case was on appeal. So, argues Northstar, the district court lacked jurisdiction to consider

the nunc pro tunc application and grant the order. Again, we disagree.

 An appeal deprives the district court of jurisdiction only as to those issues on appeal. *In re Estate of Tollefsrud,* 275 N.W.2d 412, 418 (Iowa 1979) (trial court retains jurisdiction as to collateral issues, that is, those not affecting the subject matter of the appeal). Here the nunc pro tunc order went only to a collateral matter: to correct the name of a party. This had nothing to do with the substantive issues on appeal.

### V. *Summary.*

Because BGG was not in privity with Northstar, the only damages it could recover were direct economic loss damages. The jury did not award BGG such damages. Instead it awarded BGG consequential economic loss damages to which it was not entitled. We therefore reverse on this issue. We remand to allow the district court to enter judgment in favor of Northstar and against BGG.

We affirm the district court's entry of a nunc pro tunc order amending the $21,473.63 indemnity judgment for Copeland to reflect Northstar's true corporate name.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.**