# IN THE SUPREME COURT OF IOWA

No. 06–1018

Filed March 6, 2009

**WELLS DAIRY, INC.,**

Appellant,

vs.

**AMERICAN INDUSTRIAL REFRIGERATION, INC.,** and **REFRIGERATION VALVES and SYSTEMS CORPORATION,**

Appellees.

---

Appeal from the Iowa District Court for Plymouth County, James D. Scott, Judge.

Party appeals summary judgment denying its implied contractual and equitable indemnity claims. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Juli Wilson Marshall, Mary Rose Alexander, Thomas J. Heiden, Andre M. Geverola, and Matthew J. Johnson of Latham & Watkins, LLP, Chicago, Illinois, Richard H. Moeller of Berenstein, Moore, Berenstein, Heffernan & Moeller, L.L.P., Sioux City, and Bruce E. Johnson of Cutler Law Firm, P.C., West Des Moines, for appellant.

Matthew T. Early of Rawlings, Neiland, Probasco, Killinger, Ellwanger, Jacobs & Mohrhauser, LLP, Sioux City, and Michael D. Hutchens, Jenneane L. Jansen, and Jennifer E. Ampulski of Meagher &

Geer, PLLP, Minneapolis, Minnesota, for appellee American Industrial Refrigeration, Inc.

John D. Mayne and Missy J. Denton of Bikakis, Mayne, Arenson & Hindman, Sioux City, and Lindsay G. Arthur and Christopher D. Newkirk of Arthur, Chapman, Kettering, Smetak & Pikala, P.A., Minneapolis, Minnesota, for appellee Refrigeration Valves and Systems Corporation.

**APPEL**, **Justice**.

In this case, we peer into the abyss of indemnity law. Specifically, we must decide whether the district court properly granted summary judgment in favor of American Industrial Refrigeration, Inc. (AIR) and Refrigeration Valves & Systems Corp. (RVS) in an indemnification action brought by Wells Dairy, Inc. following a fire and explosion at one of its plants. The explosion and subsequent fire allegedly prevented Wells from completing performance of its contract with Pillsbury Co., Inc. to produce ice cream. The district court granted AIR and RVS summary judgment on Wells' indemnification actions. For the reasons expressed below, we affirm in part, reverse in part, and remand for further proceedings.

## I. Factual and Procedural History.

**A. Nature of Underlying Litigation.** On or about January 28, 1999, Wells and Pillsbury entered into a contract whereby Wells agreed to manufacture at its facility in Le Mars, Iowa certain Häagen-Dazs frozen dessert products marketed by Pillsbury. The contractual terms included minimum levels of production by Wells over a fixed term. The contract provided that Wells could manufacture Häagen-Dazs only at its South Ice Cream Plant unless Wells obtained Pillsbury's written consent.

Two months after the contract was signed, an explosion and fire occurred at the South Ice Cream Plant. The explosion resulted from the catastrophic failure of a check valve in a pipeline of the ammonia refrigeration system. The failure of the check valve caused thousands of pounds of liquid ammonia to spill onto the floor of the plant. An electrical charge subsequently caused the explosion and resulting fires. The explosion and fires extensively damaged the South Ice Cream Plant and resulted in an immediate and complete shutdown of the facility.

In August 2002 Pillsbury filed an action in district court against Wells for breach of contract and negligence. Thereafter, Wells filed the instant third-party action against AIR and RVS seeking indemnification and contribution for any damages owed to Pillsbury. In the indemnification action, Wells asserted that the explosion and fire were caused by a defective refrigeration system that AIR and RVS installed, designed, and sold to Wells. After discovery, AIR and RVS filed motions for summary judgment against Wells.

**B. Relationship between Wells and AIR.** The undisputed facts show that in 1991 Wells hired AIR to design and install a multi-million dollar refrigeration system at the South Ice Cream Plant. The bid documents submitted by AIR and accepted by Wells called for AIR to supply a "total systems engineering and turnkey proposal," including ammonia refrigeration. In its proposal, AIR stated that its system would be code-compliant, would be made with the "highest quality material and workmanship available," and would include numerous safety controls.

The contract between Wells and AIR also contained several service provisions. Among other things, the contract provided that AIR would supply the services of one control system designer for the maximum of one hundred and eighty hours, one field technician for a maximum of one hundred and eighty hours, and "include[ ] services of King Gauge Field Service personnel to review installation, calibrate tank level controls, and provide training services." When a problem arose with the refrigeration unit, Wells employees would "give them [AIR] a call on the phone and say, hey, we have an issue or whatever it was." In addition, AIR conducted at least two training sessions at Wells on the safe operation of the system in 1994 and 1996.

**C. Relationship between Wells and RVS.** The undisputed facts show that RVS is a supplier of vessels, piping, and components for ammonia refrigeration systems. RVS supplied much of the equipment for the south plant refrigeration system, including the selection of the pressure vessels, piping, various valves, and, specifically, the check valve that catastrophically failed.

The parties dispute whether RVS had a contractual relationship with Wells. RVS contends it merely sold goods to AIR and shipped them to Wells. In blueprints and engineering specifications prepared by RVS, the client is described as "AIR/Well's South Plant." Wells alternatively asserts that a contractual relationship existed between it and RVS.

**D. District Court Ruling.** The district court granted AIR's and RVS's motions for summary judgment. The district court found there was no express agreement to indemnify between the parties. The district court further held that no implied duty to indemnify arose from the series of finite agreements between AIR/RVS and Wells.

The district court also granted Wells' motion for summary judgment on the underlying claim brought by Pillsbury. Such a ruling rendered Wells' indemnification claim moot. This court, however, has reversed the district court's grant of summary judgment in the underlying action. *See Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430 (Iowa 2008). As a result, Wells' indemnification claims against AIR and RVS remain live rounds on the battlefield awaiting our disposition.

**II. Standard of Review.**

We review the district court's ruling on a motion for summary judgment for correction of errors at law. *Buechel v. Five Star Quality Care, Inc.*, 745 N.W.2d 732, 735 (Iowa 2008). Summary judgment is proper if the entire record before the court shows that there is no

genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Phillips v. Covenant Clinic*, 625 N.W.2d 714, 717 (Iowa 2001). Every legitimate inference that can reasonably be deduced from the evidence should be afforded the party resisting the motion for summary judgment, and a fact question is generated if reasonable minds can differ on how the issue should be resolved. *Id.* at 718.

### III. Discussion.

**A. Analytical Framework.** Indemnification is a form of restitution. *Iowa Elec. Light & Power Co. v. Gen. Elec. Co.*, 352 N.W.2d 231, 236 (Iowa 1984). Indemnity shifts the entire liability or blame from one legally responsible party to another. *Federated Mut. Implement & Hardware Ins. Co. v. Dunkelberger*, 172 N.W.2d 137, 142 (Iowa 1969), *superseded by statute*, 1971 Iowa Acts ch. 131, § 94, *as recognized in Ayers v. Straight*, 422 N.W.2d 643, 646 (Iowa 1988). Indemnity is, in short, a redistribution of risk. Nicholas P. Alexander, *Developments in Indemnity Law: Express, Implied Contractual, Tort-Based & Statutory*, 79 Mass. L. Rev. 50, 51 (1994).

The nomenclature used by courts for implied indemnity claims can be confusing and is not always used with precision. When an implied obligation to indemnify arises from an existing contractual relationship, it is often said to involve an implied-in-fact obligation, or implied contractual indemnity. *See* E. Eugene Davis, *Indemnity Between Negligent Tortfeasors: A Proposed Rationale*, 37 Iowa L. Rev. 517, 538 (1952); Dale B. Furnish, *Distributing Tort Liability: Contribution & Indemnity in Iowa*, 52 Iowa L. Rev. 31, 35 (1966). When indemnity arises outside of a contractual setting, it is often referred to as an obligation implied-in-law, or equitable indemnity. *Id.* Sometimes, however, the

term implied indemnity is used to include both implied contractual indemnity and equitable indemnity, which can lead to considerable confusion. *See generally 17 Vista Fee Assocs. v. Teachers Ins. & Annuity Ass'n of Am.*, 693 N.Y.S.2d 554 (App. Div. 1999).

For the purposes of clarity in this opinion, we refer to implied contractual indemnity as including indemnity claims (other than express indemnity) arising out of contractual relations. We use the term equitable indemnity to refer to distinctly different indemnity claims which arise from the noncontractual legal relationships between the indemnitor and the indemnitee.

1. *Implied contractual indemnity.* It has been widely accepted for decades that indemnity may, in some instances, arise from a contractual relationship even if the parties did not expressly include an indemnity clause in the contract. *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.*, 350 U.S. 124, 133, 76 S. Ct. 232, 237, 100 L. Ed. 133, 141 (1956), *superseded by statute as stated in Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 262, 99 S. Ct. 2753, 2757, 61 L. Ed. 2d 521, 528 (1979). The standard for implying a contractual indemnity obligation, however, is generally quite high. As stated by the New York Court of Appeals, in order for a court to imply a contractual right to indemnification, there must be an "unmistakable intent" to indemnify. *Hogeland v. Sibley, Lindsay & Curr Co.*, 366 N.E.2d 263, 266 (N.Y. 1977).

Under Iowa law, we have couched our implied contractual indemnity doctrine in terms of an "independent duty," stating that an implied contractual duty to indemnify may arise from a contractual relationship that lacks an express obligation to indemnify where there are "independent duties" in the contract to justify the implication. *McNally & Nimergood v. Neumann-Kiewit Constructors, Inc.,* 648 N.W.2d

564, 573 (Iowa 2002); *Iowa Elec.*, 352 N.W.2d at 236. Such "independent duties" arise in the context of implied contractual indemnity when the contract implies "a mutual intent to indemnify for liability or loss resulting from a breach of the duty." *McNally*, 648 N.W.2d at 573. In other words, we have found an implied contractual duty to indemnify where the circumstances require that a party to an agreement "ought to act as if he had made such a promise, even though nobody actually thought of it or used words to express it." *Woodruff Constr. Co. v. Barrick Roofers, Inc.*, 406 N.W.2d 783, 785 (Iowa 1987).

It is not necessary that a party seeking indemnity under a theory of implied contractual indemnity be blameless in connection with the incident. In *Iowa Power & Light Co. v. Abild Construction Co.*, an employer company who was negligent toward its own employee was still able to recover on an implied contractual indemnity theory where the indemnitor breached its contractual obligation to notify the employer of construction activity around power lines. 259 Iowa 314, 338, 144 N.W.2d 303, 317 (1966). The question in an implied contractual indemnity case, therefore, is whether a duty arising from the contract has been violated and, if so, what damages flow directly from breach of that duty.

While recognizing that implied contractual indemnity can arise in special circumstances, our cases clearly demonstrate that implied contractual indemnity does not arise from plain vanilla contracts. For example, implied contractual indemnity is generally not found in ordinary purchase agreements. *Johnson v. Interstate Power Co.*, 481 N.W.2d 310, 319 (Iowa 1992). Similarly, contracts involving the sale of services that give rise only to a general duty of care do not give rise to implied contractual indemnity. *Merryman v. Iowa Beef Processors, Inc.*,

978 F.2d 443, 445 (8th Cir. 1992); *Cochran v. Gehrke Constr.*, 235 F. Supp. 2d 991, 1003–04 (N.D. Iowa 2002); Roger W. Stone & Jeffrey A. Stone, *Indemnity in Iowa Construction Law*, 54 Drake L. Rev. 125, 147 (2005) (noting only contractual duties of a specific and defined nature give rise to implied contractual indemnity). Something beyond a routine service contract triggering only general duties of care or a sale-and-purchase contract is required to support an implied contractual indemnity claim.

2. *Equitable indemnity.* When equitable indemnity is involved, the intention of the parties to indemnify, unlike the case of implied contractual indemnity, is not relevant. Instead, the law imposes indemnity due to the relationship of the parties and the underlying loss regardless of intention. Equitable indemnity arises from *noncontractual* obligations. *See* Davis, 37 Iowa L. Rev. at 538 (noting implied-at-law indemnity does not really involve a contract at all). It is a murky doctrine based on notions of fairness and justice.

A classic branch of equitable indemnity is based upon vicarious liability. In the vicarious liability cases, the relationship of the indemnitor and the indemnitee is such that fairness and justice requires that the party primarily responsible for the underlying injury should bear the liability. Vicarious liability is commonly used in cases involving respondeat superior, principals and agents, employers and employees, or other similar relationships. We have adopted indemnity based on vicarious liability in Iowa. *Rozmajzl v. Northland Greyhound Lines*, 242 Iowa 1135, 1143, 49 N.W.2d 501, 506 (1951).

Another traditional branch of equitable indemnity has been utilized by courts in the context of joint tortfeasors where there is a great disparity in fault. Often expressed as involving a distinction between

active and passive negligence, this tort-based doctrine was designed as a rule to avoid the harshness of the contributory negligence doctrine before the era of comparative fault. *See* Francis H. Bohlen, *Contribution & Indemnity between Tortfeasors*, 21 Cornell L. Rev. 552, 554 (1936). While we adopted indemnity based on active-passive negligence decades ago, we abandoned this branch of equitable indemnity in light of the enactment of Iowa's Comparative Fault Act. *Britt-Tech Corp. v. Am. Magnetic Corp.*, 487 N.W.2d 671, 673 n.1 (Iowa 1992); *Am. Trust & Sav. Bank v. United States Fidelity & Guar. Co.*, 439 N.W.2d 188, 190 (Iowa 1989).

Some courts have embraced a third branch of equitable indemnity based upon an "independent duty" between the indemnitor and the indemnitee. *See generally* Andrew Kull, *The Source of Liability in Indemnity & Contribution*, 36 Loy. L.A. L. Rev. 927, 932–35 (2003). Although using vocabulary similar to that used in implied contractual indemnity, the theory is markedly different. In equitable indemnity based on "independent duties," there is no effort to determine whether the parties would have agreed to indemnity had they addressed the issue. Instead, the question is whether there is some duty between the indemnitor and the indemnitee sufficient to impose indemnity on the indemnitor as a matter of law. *Id.* at 933.

Because "independent duty" equitable indemnity cases do not require common liability, they are not, at their core, based upon unjust enrichment. *Id.* Rather, independent duty equitable indemnity cases are based on notions of fairness based on the nature of the relationship between the indemnitor and the indemnitee and the underlying cause of the injury or damage claimed by the first-party plaintiff. *Id.*

What constitutes an "independent duty" for purposes of equitable indemnity is not always clear. However, a number of cases have held that a breach of duty by licensed engineering professionals toward their clients is sufficient to support indemnification. *Peters v. Mindell*, 620 A.2d 1268, 1271–72 (Vt. 1992). In these cases, indemnification is not based upon a contractual relationship, but rather upon a tort involving a special relationship between the licensed professional and a client.

Most of the indemnity cases in Iowa dealing with "independent duties" are cases involving *implied contractual indemnity*. *See McNally*, 648 N.W.2d at 573. We have, however, recognized equitable indemnity based on an independent duty. *Hansen v. Anderson, Wilmarth & Van Der Maaten*, 630 N.W.2d 818, 826 (Iowa 2001). We have not had the opportunity to develop this branch of equitable indemnity in great detail.

Some courts have gone beyond the "independent duty" doctrine and decided to impose liability based on "simple fairness." Kull, 36 Loy. L.A. L. Rev. at 939 (citing *City of New York v. Lead Indus. Ass'n*, 644 N.Y.S.2d 919, 921 (App. Div. 1996), and *McDermott v. City of New York*, 406 N.E.2d 460, 462 (N.Y. 1980)). The merits of an approach to indemnity based upon "simple fairness" have been subject to considerable academic debate. *Id.* at 941 n.30 (comparing Peter Linzer, *Rough Justice: A Theory of Restitution & Reliance, Contracts & Torts*, 2001 Wis. L. Rev. 695, with Emily Sherwin, *Restitution & Equity: An Analysis of the Principle of Unjust Enrichment*, 79 Tex. L. Rev. 2083 (2001)). Application of equitable indemnity based solely on notions of simple fairness could cover a lot of legal territory. We have criticized equitable indemnity based solely on fairness, citing the need for stability in the law. *Woodruff*, 406 N.W.2d at 785–86.

**B. Indemnification Claim against AIR.**

1. *Implied contractual indemnity.* Wells asserts that it is entitled to implied contractual indemnity from AIR.[1] Wells cites two features of the contract as support. First, Wells asserts that contractual indemnity is implied as a result of AIR's contractual duty over time to inspect and perform necessary repairs to the refrigeration system. Second, Wells claims indemnity is implied due to AIR's contractual duty to provide safety devices. For the reasons expressed below, we conclude that AIR is entitled to summary judgment on the implied contractual indemnity claim.

The undisputed facts show that AIR agreed to provide Wells with refrigeration equipment and services. Some of the services were provided after the installation of the equipment. At no time, however, did AIR assume an ongoing duty to maintain the equipment or to ensure its safe operation. A contract to provide maintenance services or training as needed does not give rise to an implied contractual obligation to indemnify if the equipment, which is under the day-to-day control of the purchaser, fails to perform. *Merryman*, 978 F.2d at 445.

Nothing in *McNally* is to the contrary. In *McNally*, the crane which caused the accident was under the exclusive control of the contractor who had leased it. *McNally*, 648 N.W.2d at 568. As a result, independent duties to maintain the crane in good condition and notify the owner of any damage to the crane were implicitly imposed in the contract. *Id.* at 573. Here, the equipment was not within the exclusive control of AIR, but was under the control of Wells. There is no basis in the contractual relationship of the parties to imply that, had they

---

[1]Wells makes no claim of indemnity based upon express contract.

thought about it, they would have thrust an indemnity obligation onto AIR. *Woodruff*, 406 N.W.2d at 785.

We also hold that a contractual obligation to provide equipment that meets certain safety standards does not give rise to an implied indemnity obligation in the event of subsequent malfunction. Such a promise is merely a promise to provide equipment with certain characteristics. *Johnson*, 481 N.W.2d at 319–20. It does not provide "independent duties" sufficient to support implied contractual indemnity similar to those contained in *McNally*.

2. *Equitable indemnity based on professional duties.*[2] The first argument advanced by Wells in support of its equitable indemnity claim is that because its contract with AIR involved the provision of professional engineering services, AIR has an "independent duty" sufficient to support an equitable indemnity claim. We agree. Claims of professional negligence are independent of underlying contractual obligations. *City of Mounds View v. Walijarvi*, 263 N.W.2d 420, 423 (Minn. 1978).

In *Cochran,* the federal district court refused to recognize equitable indemnity under Iowa law in a case that involved "nothing more than the general duty that every member of society owes to every other member— the duty not to harm through tortious acts." *Cochran,* 235 F. Supp. 2d at 1002. The duties of a professional engineer, however, are not the same as general duties owed to everyone by everybody, but are more

---

[2]AIR asserts that equitable indemnity is inapplicable here due to the operation of the force majeure clause in the underlying contract between Wells and Pillsbury. Specifically, AIR asserts that either Wells is at fault for the explosion and thus not entitled to equitable indemnity or it is not at fault, in which case Wells would not be liable to Pillsbury for any breach under the force majeure clause. AIR, however, has failed to assert any legal authority on the proper interpretation of the force majeure clause. As such, this court deems the issue not properly raised on this appeal. *See* Iowa R. App. P. 6.903(2)(*g*)(3).

specific and defined. *Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1369 (N.Y. 1992) (finding professional obligations involve more than generalized duty of care).

We also agree with Wells that it is not necessary that the proposed indemnitor be liable to the first-party plaintiff in order to establish a claim for indemnity based on an independent duty. The requirement of common liability was a rule that applied in the context of the now abandoned active-passive negligence branch of equitable indemnity. It does not apply in the context of equitable indemnity based on independent duties. *Hansen*, 630 N.W.2d at 823; *see also Cochran*, 235 F. Supp. 2d at 998–99 (finding under Iowa law, only active-passive branch of equitable indemnity requires common liability); Stone & Stone, 54 Drake L. Rev. at 129 (noting indemnity does not require common liability and is permitted where there is an agreement, relationship, or duty between the indemnitor and the indemnitee).

In light of the summary judgment record and the issues raised on appeal, there are triable issues regarding whether AIR engaged in acts of professional negligence and whether the acts of negligence caused the underlying explosion. Any liability to Wells, of course, is contingent upon Wells being liable to Pillsbury on the underlying contract. The record reveals a proverbial battle of experts on these issues. As a result, AIR is not entitled to summary judgment on the equitable indemnity claim based on an alleged breach of professional duties.

3. *Equitable indemnity based upon U.C.C. warranties.* Wells argues that implied warranties of fitness for ordinary use and fitness for a particular purpose under the U.C.C. give rise to independent duties sufficient to support a claim of indemnity. These implied warranties

arise by operation of law in connection with the sale of goods. *See* Iowa Code §§ 554.2314, .2315.

In support, Wells cites the case of *Peters v. Lyons*, 168 N.W.2d 759 (Iowa 1969). In *Peters*, a dog owner specifically sought a chain capable of constraining her large dog. *Peters*, 168 N.W.2d at 761. When told of the size of the dog, the seller told the purchaser that the chain was "the best we've got, that ought to do it." *Id.* The chain ultimately failed to hold the dog, who attacked a third party. *Id.* The victim sued the dog owner under a statute imposing strict liability for dog bites. *Id.* The insurer of the dog owner sought indemnity from the seller. *Id.* We held that the owner's insurer was entitled to indemnity. *Id.* at 767. In reaching this conclusion, we cited the implied warranty of fitness and merchantability made by the seller under the U.C.C. in upholding the owner's indemnity claim. *Id.* at 763–66.

There is a raging controversy in the law regarding whether implied U.C.C. warranties give rise to an independent duty in equitable indemnity actions. The majority of courts have held that the U.C.C. warranty provisions support such claims. *See, e.g., City of Willmar v. Short-Elliott-Hendrickson, Inc.*, 512 N.W.2d 872, 874 (Minn. 1994); *City of Wood River v. Geer-Melkus Constr. Co.*, 444 N.W.2d 305, 311 (Neb. 1989); *Cen. Wash. Refrigeration, Inc. v. Barbee*, 946 P.2d 760, 763 (Wash. 1997) (en banc). There is a minority view, which asserts that a breach of an implied warranty under the U.C.C. is nothing more than a simple breach of contract. *See Superior, Inc. v. Behlen Mfg. Co.*, 738 N.W.2d 19, 26 (N.D. 2007); *Perry v. Pioneer Wholesale Supply Co.*, 681 P.2d 214, 219 (Utah 1984).

Based on stare decisis, however, we decline to disturb the approach announced in *Peters*. As a result, AIR is not entitled to

summary judgment on the equitable indemnity claim based upon an alleged breach of U.C.C. warranties.

**C. Indemnity Claims against RVS.**

1. *Issue preservation.* RVS argues that Wells did not properly preserve the issue of independent duty in this case. RVS claims that the first time Wells raised the issue of an independent duty to indemnify was in its opposition to RVS's motion for summary judgment. RVS argues that a careful reading of the Wells' cross-petition against RVS does not reveal even a hint of the theories espoused in its opposition to summary judgment.

We reject RVS's preservation claim. We continue to rely upon notice pleading in Iowa. As such, it is not necessary to raise a specific theory of liability, but only to state the basis in broad, general terms. Iowa R. Civ. P. 1.402(2)(*a*). The parties may utilize ordinary discovery techniques to determine the basis of the underlying claim. *Cemen Tech, Inc. v. Three D Indus., L.L.C.*, 753 N.W.2d 1, 12 (Iowa 2008).

2. *Implied contractual indemnity.* Wells asserts that engineering specifications, blueprints, and sales invoices collectively amount to a contractual agreement between it and RVS. Wells claims that pursuant to this contractual relationship, RVS had a duty to provide safety features for the component parts it supplied to AIR and had a duty to inspect its work and recommend necessary repairs and modifications. From these contractual obligations, Wells argues that an implied contractual duty to indemnify arises.

RVS responds that it at no time had a contractual relationship with Wells. RVS further asserts that even if a contractual relationship existed, the relationship only amounted to a sale-and-purchase agreement that did not give rise to indemnity obligations.

We agree with RVS. A contract requires offer, acceptance, and sufficiently definite terms to be enforced. While we have held that a series of documents may give rise to a contractual relationship, *Horsfield Construction, Inc. v. Dubuque County, Iowa*, 653 N.W.2d 563, 570 (Iowa 2002), we find that under the undisputed facts, RVS and Wells did not have a contractual relationship under the series of documents presented here.

The blueprints that are said to be part of the contract here are simply that, blueprints. There is nothing in them that suggests an offer, acceptance, or legal duty between RVS and Wells. *Crum Elbow Sportsmen's Ass'n v. Whelan*, 73 N.Y.S.2d 531, 532–33 (Sup. Ct. 1947) (holding blueprints and a check do not amount to binding contract for sale of land).

Similarly, the sales invoices document a series of purchases between RVS and AIR, not between RVS and Wells. Each of these invoices states that RVS sold the items to AIR for shipment to Wells. The fact that the merchandise was shipped to Wells is not evidence of a contractual relationship between Wells and RVS. There can be no basis for implied indemnity based on independent contractual duties where there is no underlying contract between the parties.

Moreover, even if there were a contract, there is no basis for implied contractual indemnity. The documents reflect at most purchase orders. There is no contractual language or contractual duty that demands that an indemnification obligation be implied for such purchase orders. *Johnson*, 481 N.W.2d at 320.

3. *Equitable indemnity based on professional duties.* Wells asserts that RVS had noncontractual independent duties sufficient to give rise to equitable indemnity. Specifically, Wells claims that it was RVS's client

and that, as a result, RVS had a duty to perform its work to the standard of the engineering profession and to provide a refrigeration system that was fit for ordinary use and/or intended use.

RVS does not challenge the assertion that it had an engineering relationship with Wells.[3] Based on our holding on the identical issue with respect to AIR, we conclude that RVS is not entitled to summary judgment on the equitable indemnity claim based upon an alleged breach of professional duties.

4. *Equitable indemnity based on U.C.C. warranties.* We have already determined that there is no contractual relationship between RVS and Wells. This lack of privity is dispositive of the equitable indemnity claim against RVS based upon U.C.C. warranties.

This court has, of course, eliminated the privity requirement in products liability cases raising a breach-of-implied-warranty claim. *State Farm Mut. Auto. Ins. Co. v. Anderson-Weber, Inc.*, 252 Iowa 1289, 1301, 110 N.W.2d 449, 456 (1961). Nevertheless, the claims that may be brought by a remote purchaser are limited.

While we have held that a nonprivity purchaser may recover "direct economic loss" for breaches of implied warranties under the U.C.C., we have repeatedly held that a remote purchaser of goods cannot recover "consequential economic loss" from a vendor under an equitable indemnity theory. *Kolarik v. Cory Int'l Corp.*, 721 N.W.2d 159, 163 n.3 (Iowa 2006); *Beyond the Garden Gate, Inc. v. Northstar Freeze-Dry Mfg.,*

---

[3]The fact that Wells and RVS are not in privity does not necessarily mean that RVS owes no professional duties toward Wells. For example, in *John T. Jones Construction Co. v. Hoot General Construction*, 543 F. Supp. 2d 982, 1009 (S.D. Iowa 2008), a federal district court sitting in diversity held that under Iowa law, the duties of a professional extended to those who would foreseeably rely on the engineer's services. Because RVS in this appeal does not challenge the assertion that it owes a duty to Wells, we do not need to confront the issue in this appeal.

*Inc.*, 526 N.W.2d 305, 309 (Iowa 1995). Direct economic loss is the difference between the value of goods as warranted and the value of goods actually delivered, while consequential economic losses includes all losses caused by the defective product. *Id.*

In this case, the recovery which Wells seeks—indemnity for the contractual claims of Pillsbury—is a consequential economic loss. As such, the loss would not be recoverable in a direct breach of warranty action under the U.C.C. due to Wells' lack of privity with RVS. It would be illogical for indemnity based upon independent duties established by implied U.C.C. warranties to provide greater substantive relief than would be available in a direct action under the U.C.C. Therefore, RVS is entitled to summary judgment on the equitable indemnity claim based upon U.C.C. warranties.

## IV. Conclusion.

For the above reasons, we conclude that AIR and RVS are entitled to summary judgment on Wells' claim for implied contractual indemnity. On the question of equitable indemnity, however, we hold that AIR and RVS are not entitled to summary judgment on the claims of equitable indemnification based upon the independent duties of professional engineers. With respect to equitable indemnity based on U.C.C. warranties, we conclude RVS is entitled to summary judgment, but AIR is not. As a result, the district court is affirmed in part, reversed in part, and the case is remanded to the district court for further proceedings.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

All justices concur except Hecht and Baker, JJ., who take no part.