**THE NATIONAL BANK,**
Plaintiff–Appellant,

v.

**FCC EQUIPMENT FINANCING,
INC., Defendant–Appellee.**

No. 10–0837.

Court of Appeals of Iowa.

Feb. 9, 2011.

Douglas R. Lindstrom and Richard A. Davidson of Lane & Waterman, L.L.P., Davenport, for appellant.

Michael A. Dee of Brown, Winick, Graves, Gross, Baskerville & Schoenebaum, P.L.C., Des Moines, Daniel S. Rubin of Howard & Howard Attorneys, P.L.L.C., Chicago, Illinois, and William P. Rector of Bozeman, Neighbour, Patton & Noe, L.L.P., Moline, Illinois, for appellee.

Heard by SACKETT, C.J., and POTTERFIELD and MANSFIELD, JJ.

MANSFIELD, J.

### I. Introduction.

THE National Bank (TNB) wired money to FCC Equipment Financing, Inc.

(FCC), which held a lien on five trucks. TNB anticipated that these funds—together with additional funds from TNB's customer—would enable FCC's lien to be paid off and TNB's customer to acquire the trucks with TNB becoming the new secured lender. As it turned out, the customer did not have enough money to pay off the balance of FCC's lien. TNB accordingly seeks recovery of the wired funds from FCC under principles of unjust enrichment, mistake, and negligent nondisclosure. Because we believe TNB does not have a valid cause of action for unjust enrichment or mistake, *see* Restatement (First) of Restitution § 14 (1937) and Restatement (Third) of Restitution and Unjust Enrichment § 67 (Tent. Draft No. 7 2010), or for negligent nondisclosure, we affirm the judgment below.

## II. Facts and Procedural Background.

This case was decided on cross-motions for summary judgment, and the relevant facts are essentially undisputed. Freedom Transportation, Inc. (Freedom) wanted to purchase five used Volvo trucks from Alliance Transportation Group, L.L.C. (Alliance). The trucks were encumbered by a lien of approximately $232,000 in favor of FCC.

TNB agreed to lend Freedom $195,000 for the purchase of the trucks. River Valley Capital Corp. (River Valley) acted as a broker-agent for the transaction and handled the execution and delivery of the documents.

On February 16, 2008, Freedom executed a promissory note for $193,500 in favor of TNB as well as a security agreement granting TNB a security interest in the trucks. The promissory note was personally guaranteed by Freedom's President, Petar Panteleymonov. Freedom also provided TNB with a copy of an official check for $38,784.75 payable to FCC that Freedom represented would be used as a down payment on the trucks. The $38,784.75 was to cover the balance of FCC's $232,000 lien.

On February 19, 2008, TNB wired $193,125 to FCC.[1] The wire was received by FCC and posted on February 20. However, as of February 25, 2008, FCC was still awaiting the balance of the payoff. One of its employees stated, "We received a wire while I was out [last] week, however it was short $38,784K. I am following to see where the balance is." On March 12, 2008, FCC was still awaiting the full payoff. The record indicates both FCC and TNB expected Freedom to pay off FCC directly. An FCC internal note indicates, "Per Jen customer who purchase equip only sent partial pay amount. Will send balance once they inspect equip. Continue to hold as of 3/12." TNB at some point discovered that Freedom's official check was invalid. TNB claims it was not informed by FCC that FCC had not received the balance of the payoff from Freedom.

It appears Freedom made payments to TNB on its loan with TNB. This reduced the balance on TNB's loan from $193,500 to $174,636.99. But the FCC loan was never paid off.

When TNB discovered the problem, it demanded FCC return the $193,125 that had been wired to it. FCC refused, so TNB brought suit against Freedom, Panteleymonov, River Valley, and FCC. Against FCC, TNB alleged theories of unjust enrichment, mistake of fact, and negligent nondisclosure. On cross-motions for summary judgment, the district court

---

1. The remaining loan amount of $375 was collected by TNB as a fee.

ruled for FCC and dismissed TNB's claims against it.[2] TNB now appeals.

### III. Standard of Review.

█ We review the district court's ruling on a motion for summary judgment for correction of errors at law. *Wells Dairy, Inc. v. Am. Indus. Refrigeration, Inc.*, 762 N.W.2d 463, 469 (Iowa 2009). Summary judgment is proper if the entire record before the court shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.*

### IV. Analysis.

We believe this case presents a typical "discharge for value" scenario: A payor makes a payment to a creditor that discharges a debt, in full or in part. Later, the payor alleges the payment should not have been made to the creditor and tries to recover it under principles of unjust enrichment. Historically, courts do not allow such transactions to be unwound. Thus, section 14(1) of the Restatement (First) of Restitution, entitled "Discharge for Value," provides:

> A creditor of another or one having a lien on another's property who has received from a third person any benefit in discharge of the debt or lien, is under no duty to make restitution therefor, although the discharge was given by mistake of the transferor as to his interests or duties, if the transferee made no misrepresentation and did not have notice of the transferor's mistake.

Restatement (First) of Restitution § 14(1), at 55 (1937). As stated in the comments to section 14, "The rule stated in this Subsection applies to many types of situations." *Id.* cmt. b, at 56.

In its latest tentative draft, the American Law Institute has proposed to continue the same basic rule:

(1) A payee without notice takes payment free of a restitution claim to which it would otherwise be subject, but only to the extent that

   (a) the payee's receipt of the funds reduces the amount of the payee's valid claim as creditor of the payor or of another person; or

   (b) the payee's receipt of the funds reduces the amount of the payee's claim pursuant to an obligation or instrument that the payee has previously acquired for value and without notice of any infirmity; or

   (c) the payee's receipt of the funds reduces the amount of the payee's inchoate claim in restitution against the payor or another person.

(2) A payee is entitled to the defense described in this Section only if payment becomes final, and the payee learns of the payment and its ostensible application, before the payee has notice of the facts underlying the restitution claim the defense would cut off. For purposes of this subsection, a payment becomes final when the payor is no longer entitled to countermand or recover it without the aid of legal process.

Restatement (Third) of Restitution and Unjust Enrichment § 67 (Tent. Draft. No. 7 2010). Moreover, "the most salient feature of § 67 is that it protects a payee without the need to demonstrate any change of position on receipt." *Id.* cmt. b.

According to one treatise quoted by the reporter's note to the tentative draft:

---

**2.** Following the grant of summary judgment for FCC, TNB dismissed its causes of action against Freedom, Panteleymonov, and River Valley.

In situations of endless variety, courts have denied restitution because money paid by one party was received in good faith by the other in satisfaction of or as security for a valid claim against a third person. In addition, there are numerous cases in which this should have been the reason for refusing relief, but instead the court gave another reason, often unsatisfactory, to support a just result.

*Id.* Reporter's Note cmt. d (quoting 3 Palmer, Law of Restitution § 16.6, at 490–491 (1978) (footnotes omitted)).

A number of recent banking decisions have followed this rule. For example, in *Banque Worms v. BankAmerica International,* 928 F.2d 538, 540 (2d Cir.1991), where a bank mistakenly wired approximately $2 million of funds to a *different* creditor of its customer than its customer had instructed, the bank was not allowed to recoup the $2 million from the unintentionally benefited creditor on the basis of unjust enrichment. The court, after certifying the legal question to the New York Court of Appeals and receiving a response, found the "discharge for value" rule barred recovery. *Banque Worms,* 928 F.2d at 541. The court reached this result even though the bank had made an immediate demand for return of the mistakenly wired funds, and thus return of the funds would not have prejudiced the unintentionally benefited creditor. *Id.*

Similarly, in *Greenwald v. Chase Manhattan Mortgage Corp.,* 241 F.3d 76 (1st Cir.2001), the court denied unjust enrichment recovery to an escrow agent that had wired funds to pay off mortgages under the erroneous belief that it had good funds from its customer. The court concluded Massachusetts, like New York in *Banque Worms,* would follow the "discharge for value" rule. *Greenwald,* 241 F.3d at 81.

And in *Credit Lyonnais New York Branch v. Koval,* 745 So.2d 837 (Miss. 1999), the Supreme Court of Mississippi applied the "discharge for value" rule to deny an attempt to recover funds that had been wired in error. In that case, a Mississippian had deposited approximately $86,000 with the Luxembourg branch of a bank, and thus was a creditor of the bank to that extent. *Koval,* 745 So.2d at 838. When the bank had to be liquidated, Luxembourg's "deposit protection scheme" (DPS) by mistake sent two $14,000 transfers to the Mississippian on consecutive days, even though the maximum amount payable by the DPS was $14,000 in total. *Id.* Rejecting the DPS's attempt to recover the second transfer, the court observed,

Under the discharge for value rule of restitution, when a beneficiary receives money to which he is entitled and has no knowledge that the money was erroneously wired, the beneficiary can treat the wire as final and not repay funds erroneously wired.

*Id.; see also Department of Gen. Servs. v. Collingdale Millwork Co.,* 71 Pa.Cmwlth. 286, 454 A.2d 1176, 1180 (Pa. Commw.Ct.1983) (holding that where a creditor of defaulting contractor—instead of the bonding company—received payment from a state agency by mistake, the agency could not recoup the erroneous payment; noting that "the judgment creditor who by definition has an entitlement, is a bona fide purchaser for value in giving up his claim and is therefore not unjustly enriched").

■ We are not aware of a reported decision in Iowa that has expressly adopted the "discharge for value" rule, but Iowa generally follows the common law of restitution as summarized in the Restatement. *See, e.g., Department of Human Servs. ex rel. Palmer v. Unisys Corp.,* 637 N.W.2d 142, 156–57 (Iowa 2001) (citing

unjust enrichment under Restatement section 1); *Schwennen v. Abell*, 471 N.W.2d 880, 883–84 (Iowa 1991) (adopting the Restatement rule for voluntary payment cases involving reversed judgments); *Nachazel v. Mira Co., Mfg.*, 466 N.W.2d 248, 253 (Iowa 1991) (citing Restatement for equitable liens).

The underlying justification for the rule is that a creditor receiving money in satisfaction of debt has not been unjustly enriched. More generally, there are sound economic and policy reasons behind this rule. As explained by Judge Easterbrook,

> [A] creditor should be able to treat funds credited in apparent payment of a debt as irrevocably his, unless news of the error precedes arrival of the funds. Costs of errors should be borne by those who make errors (the better to induce them to take care) rather than by innocent beneficiaries.

*General Elec. Capital Corp. v. Cent. Bank*, 49 F.3d 280, 284 (7th Cir.1995).

■ We believe the "discharge for value" rule applies here. FCC did not have notice that the wire was a mistake when it received the $193,125 payment. *See* Restatement (First) of Restitution § 14(1), at 55. Indeed, TNB claims to have been unaware *itself* that the official check from Freedom was not valid when it wired the $193,125 to FCC. FCC, which had not seen the check and was not familiar with the arrangements between TNB and Freedom, was in a far inferior position to detect any potential fraud than TNB. And TNB does not allege FCC made any affirmative misrepresentation. *Id.* Nor does TNB claim it sought return of the wire before payment became final.

TNB argues that FCC knew a full payoff was planned, not a partial one. But it is one thing to say FCC anticipated the total of all payments would be sufficient to cover the $232,000 loan balance, and quite another to say FCC knew the partial payment it had received from TNB was in error. In fact, TNB's mistake lay not in wiring the $193,125 (that, after all, was part of the plan); its real error was that it sent that money without assuring the rest of the payoff would also be made.

Although this is the majority rule, according to Tentative Draft No. 7 "a minority of jurisdictions" allow the payment to be reversed based on the payor's "mistake"—even if the payee had no knowledge of that mistake—provided the payee did not change its position. Restatement (Third) of Restitution and Unjust Enrichment § 67 cmt. b; *see, e.g., Wilson v. Newman*, 463 Mich. 435, 617 N.W.2d 318, 321–22 (Mich.2000). But even if Iowa were to join this smaller cadre of jurisdictions, the "mistake" alleged here is not of the kind that would warrant relief. Rather, what occurred here was "a mere misprediction or an error in judgment." Restatement (Third) of Restitution and Unjust Enrichment § 5 cmt. a (Tent. Draft No. 1 2001) (excluding this kind of oversight from the doctrine of "mistake"). At all times, TNB could have refused to send funds to FCC until it knew it had good funds from Freedom. As noted by the district court, FCC made clear in its payoff letter, "**No release will be granted unless the entire payoff is received.**" In the words of the district court: "TNB is a sophisticated lender who failed to protect itself from a credit risk." Having received a photocopy of the check, TNB took its chances. In short, this is clearly a situation where TNB bore the risk of the mistake. *Id.* § 5(2)(b).

TNB argues that *Key Pontiac, Inc. v. Blue Grass Savings Bank*, 265 N.W.2d 906 (Iowa 1978), dictates a different rule in Iowa, but the case is not on point. There a car dealer that had received a vehicle as a trade-in mailed a check to the lienholder intending to pay off the loan on that vehi-

cle. *Key Pontiac,* 265 N.W.2d at 907. Attached to the dealer's check was a remittance advice directing the lender to send the vehicle title. *Id.* The bank cashed the check, but could not and did not forward a vehicle title. *Id.* The supreme court concluded the "remittance advice attached to the check created an express obligation in defendant to send the car title." *Id.*

Our case is distinguishable. TNB did not send the funds to FCC on condition that FCC perform any task. The funds were not "sent to defendant for a specific purpose which defendant failed to perform." *id.* Rather, TNB unconditionally wired funds to FCC relying on an *expectation* that its own customer (Freedom/Panteleymonov) later failed to meet. Unlike the bank in *Key Pontiac,* FCC did not receive funds with strings attached. FCC was therefore a "payee without notice." *See* Restatement (Third) of Restitution and Unjust Enrichment § 67(1).[3]

■ We believe the foregoing disposes of TNB's claims for unjust enrichment and mistake. TNB also alleges FCC failed to inform it of Freedom's failure to pay the remaining $38,784.75, and on that basis seeks to recover for "negligent nondisclosure." Yet as the district court pointed out, this alleged failure to inform did not occur until *after* TNB had transferred the funds and the payment became final. Any failure to disclose, even if otherwise action-able, cannot be said to have induced TNB's decision to transfer the $193,125 to FCC.

On the facts presented to us, TNB clearly has claims against Freedom and Panteleymonov. In addition, Alliance may have been unjustly enriched, giving rise to a claim against it, or an argument for an equitable lien in favor of TNB on the trucks. FCC, however, has not been unjustly enriched. It merely received payment of a debt, from a party that was in a position at all times to protect its own interests.

**AFFIRMED.**

POTTERFIELD, J., concurs;
SACKETT, C.J., concurs specially.

SACKETT, C.J., (concurring specially).

I too would affirm but concur specially. I believe that FCC clearly understood it was being asked to release its lien interest in the five trucks upon payment of Freedom's debt in full so that TNB would have the sole lien on the equipment. When the full amount of consideration was not paid, it credited the payment against Freedom's account but failed to release the lien. FCC was not a payee without notice.[4]

That said, I would deny the TNB's claim because the funds it is seeking to have returned are not its funds. The funds had been loaned to Freedom in exchange for

**3.** TNB also urges us to follow *Bellevue Bank of Allen Kimberly & Co. v. Security National Bank of Sioux City,* 168 Iowa 707, 150 N.W. 1076 (1915), in which a bank that sent a draft to another bank was allowed to recover that payment after discovering it had been defrauded. *Bellevue Bank,* 168 Iowa at 711, 150 N.W. at 1077. Critically, in that case, the bank recalled the draft by wire within one hour of sending it. *Bellevue Bank* predates, of course, the adoption of Article 4 of the Uniform Commercial Code. Today, we would treat this as a situation where the payment had not become final and the bank gave no-tice before its midnight deadline. *See* Iowa Code § 554.4301 (2007) (allowing the payor bank to recover payment of a demand item by returning the item or sending written notice of dishonor before the midnight deadline). By contrast, the present case involves a final payment and thus is clearly distinguishable.

**4.** I would suggest that transactions where a new lender comes in and pays off a lien to a prior lender occur frequently between financial institutions.

Freedom's promissory note and security agreement.

